COLEMAN, Justice, for the Court:
¶ 1. The Circuit Court of Copiah County convicted David Dickerson of capital murder, arson, and armed robbery. The jury sentenced him to death for the capital murder conviction; he was sentenced to twenty years for arson and forty years for armed robbery, to run consecutively. Dickerson appeals his convictions and death sentence. Finding no error, we affirm.
Facts and Procedural History
¶2. David Dickerson and Paula Her-, rington Hamilton were in a relationship in the mid-1990s, and they had a child, Courtney Dickersom When the relationship ended, Dickerson had little contact with Paula and Courtney, unless it was negative. Paula later married Allen Hamilton. She had two children in addition to Courtney. Paula and her family lived on property .near Wesson, Mississippi. Paula’s sister,' Robin Herrington, lived with them. Several other family members lived on the property as well, including an aunt, Linda Austin, who lived in a trailer behind Paula’s house.
¶ 3. 2010, Paula sought a protective order against Dickerson, claiming that he was stalking her and then-sixteen-year-old Courtney. She also filed a criminal affidavit alleging stalking. A protective order was entered, and a hearing was set for January 25, 2011, on the related criminal allegations. On the morning "of January 25, 2011, Robin was outside Paula’s house around 6:30 a.m. when she saw a man on the property. She told Paula, who went outside to investigate. Robin heard a gunshot, and Paula yelled for her to call 911. Robin testified that Paula came back to the house, covered with blood, and the man was following her and demanding keys to a van. Robin recognized the man as David Dickerson.
¶ 4. Paula’s younger daughter, then-thirteen-year-old Kayla Herrington, was getting ready for school when her aunt Robin said a man was outside the house. Kayla testified that Paula went outside, then Kayla heard screaming, so Kayla went outside as well. Kayla saw a man “messing with a gun.” She went back inside to get her little brother, then she heard two gunshots.- Kayla took her little brother into the bathroom and-'locked the door behind them. Kayla testified that Robin joined the children in the bathroom, and Kayla called 911. Kayla then looked out the window and saw the man pouring gas on the camper, then he took the gas can and ran off. Kayla testified that she heard her sister, Courtney, say that the man was David Dickerson.
¶ 5. Courtney also was getting ready for school when her aunt Robin saw a man outside. Courtney testified that Paula went outside, then Courtney heard screaming and they all ran outside. She saw her father, David Dickerson, holding a gun to her mothér’s head. Courtney testified that Dickerson was demanding keys. Courtney tried to push Dickerson away *13 from her mother, but Dickerson punched Courtney in the face. Paula told Courtney to go to her Aunt Linda’s, so Courtney ran to Linda’s trailer. A few moments later, Paula came to the trailer, drenched in blood. They let her in and locked the door behind her. Dickerson kicked the door in, and Linda pointed a gun at him. Dickerson pointed his gun at Courtney and threatened to shoot her if Linda did not put her gun down. Paula told Courtney to leave, so she and Linda fled the trailer. Courtney testified that Dickerson was holding a gas can, and she saw him pour gasoline on Paula and throughout the trailer. Linda ran to a neighbor’s house, and Courtney ran back to Paula’s house. Courtney then saw the trailer on fire.
¶ 6. Reverend Thomas McCormick and Reverend Ken Hedgepeth were driving past Paula’s house when they saw the trailer explode. They pulled into the driveway and ran toward the burning trader. Reverends McCormick and Hedge-peth saw a man standing near the trailer. They found Paula, alive and on fire, trapped under the trailer. They testified that they pulled her away and that she smelled of gasoline. The men tried to help Paula, but she died before police arrived. She had sustained gunshots to the head and back, stab wounds to the neck and trunk, and first-degree burns.'
¶ 7. Police officers arrived and searched the, area. After speaking with Paula’s family members, Dickerson was named as a suspect and a be-on-the-lookout notice was issued. Kristina Stewart lived near Paula. She was driving home around 8:00 a.m., after taking her children to school, when she saw an unknown man emerge from the woods wet and covered in mud. She later identified Dickerson in a photographic lineup. Glenn and Betty Sue Mclnnis lived about, a mile down the road. Around 9:30 a.m., Dickerson arrived at the Mclnnises’ home and asked for gasoline. By that time, the Mclnnises knew about the situation and had been advised to be on alert for a suspicious person in the area. Glenn led Dickerson to his shop, intending to lead Dickerson away from his wife and home. Sheriffs deputies arrived and arrested Dickerson.
¶ 8. Investigators found' Dickerson’s motorcycle three-tenths of al mile from Paula’s house. Officers found recently -discarded clothing in an abandoned house not far from the scene. The clothing matched a description of Dickerson’s clothing that day. A t-shirt with blood on it was later matched to Paula. A twenty-two-ealiber pistol was discovered in a water well near the abandoned house. Ballistics- determined that the pistol matched rounds found outside Linda’s trailer as well as the bullet that was removed from.Paula.
¶ 9. A grand jury indicted Dickerson for capital murder of Paula Hamilton, arson of Linda Austin’s trailer, and armed robbery of Paula Hamilton. Dickerson maintained that he did not kill Paula and denied any involvement in the crimes. Before trial, Dickerson moved for a determination of his competency to stand trial and a determination as to whether he was intellectually disabled. The court appointed forensic psychologist Dr. Criss Lott to evaluate Dickerson. Dr. Lott determined that Dickerson was not mentaUy retarded, but he was not able to determine whether Dickerson was competent to stand trial.
¶ 10. . On Dr. Lott’s recommendation, the court ordered further evaluation by the State Hospital at Whitfield to determine competency and intellectual disability. Dickerson was observed at the State Hospital for two months. Dr. Robert Storer, a forensic psychologist, and Dr. Reb McMi-chael, a forensic psychiatrist, concluded that Dickerson was mentally competent to stand trial and that he had no credible *14 symptoms of mental illness. They found that Dickerson was uncooperative, malingering, and fabricating psychiatric symptoms. The doctors also concluded that Dickerson was not mentally retarded. The circuit court held a competency hearing, and all three doctors testified that Dickerson had the capacity to confer with counsel and that he was mentally competent to stand trial. Dickerson did not put on any evidence in the alternative. The trial court held Dickerson competent to stand trial.
¶ 11. Trial was held in July 2012. The jury heard testimony from several members of Paula’s family who were eyewitnesses to the attack, the two pastors who stopped to help, Kristina Stewart, Glenn Mclnnis, several deputies who responded to the scene, the investigator from the State Fire Marshall’s Office, and multiple forensic scientists from the Mississippi Crime Laboratory. Dickerson did not call any witnesses or put on any evidence. The jury returned guilty verdicts on all three counts.
¶ 12. During the sentencing phrase, several of Dickerson’s family members and two former employees of the Department of Human Services (DHS) testified about Dickerson’s home life as a child. Several former coworkers and employers testified about Dickerson’s work abilities. Dr. Lott testified as to his findings after evaluating Dickerson. Dr. Lott opined that Dickerson was not mentally retarded and that he thought Dickerson was exaggerating his psychological problems. Dr. Julie Schroeder, a social work professor, also testified. Dr. Schroeder had met with Dickerson and reviewed his school records, mental health records, test scores, and case file. She opined as to how Dickerson’s personality disorders and borderline executive functioning deficit could have affected his behavior.
¶ 13. The jury returned a unanimous verdict recommending the death penalty. However, the sentencing verdict failed to include any statutory aggravating factors. The circuit judge ordered the jury to review the jury instructions and return a verdict consistent with the requirements set forth therein. The jury returned with the verdict in proper form, recommending the death penalty and finding that the murder was committed while Dickerson was engaged in the commission of a burglary and that the offense was especially heinous, atrocious, and cruel. Dickerson filed a motion for a new trial, which the trial court denied. Dickerson appealed.
Discussion
¶ 14. Dickerson raises ten assignments of error on appeal. Three issues are related to his convictions, and the remainder pertain to sentencing:
I. Whether the trial court erred in finding Dickerson competent to stand trial.
II. Whether the trial court erred in failing to quash the arson indictment and in permitting the arson count to go to the jury.
III. Whether reversal is required due to the erroneous admission of inflammatory and prejudicial evidence at the culpability phase of trial.
IV. Whether the trial court erred by refusing Dickerson’s requested penalty phase instruction regarding his Atkins intellectual disability defense.[1]
V. Whether the trial court exacerbated the error and prejudice at the sentencing phase by refusing Dicker *15 son’s other proposed penalty phase instructions.
VI. Whether the trial court erred in not entering a life sentence when the jury returned a sentencing verdict that failed to find any aggravating circumstances.
VII. Whether the aggravating circumstances on which the jury was instructed were either legally or factually unsupported, rendering Dickerson’s death sentence’invalid.
VIII. Whether Dickerson’s death sentence must be vacated because it was imposed in violation of the Constitution of the United States.
IX. Whether Dickerson’s death sentence is constitutionally and statutorily disproportionate.
X. Whether the cumulative effect of the errors mandates reversal of the guilty verdict and/or the death sentence.
The Court applies heightened scrutiny when reviewing capital murder convictions where the death penalty has been imposed. Fulgham v. State, 46 So.3d 315, 322 (¶ 16) (Miss.2010) (citing Bishop v. State, 812 So.2d 934, 938 (¶ 7) (Miss.2002)).
I. Whether the trial court erred in finding Dickerson competent to stand trial.
¶ 15. Dickerson claims that the trial court’s finding that he was competent to stand trial was against the overwhelming weight of the evidence and not supported by the expert testimony. The State maintains that the circuit judge’s competency finding is supported by the evidence because all three experts opined that Dickerson was competent to stand trial. In the alternative, Dickerson contends that, even if he was competent to stand trial, the evidence of his history of mental illness precludes imposition ■ of the death penalty. The State responds that Dickerson attempts to equate mental illness with mental retardation, but that, unlike the mentally retarded, the mentally ill are constitutionally eligible for the death penalty.
A. Competence to Stand Trial
¶ 16. We will reverse a trial court’s competency determination only if it is “manifestly against the overwhelming weight of the evidence.” Hearn v. State, 3 So.3d 722, 728 (¶ 14) (Miss.2008) (quoting Martin v. State, 871 So.2d 693, 698 (Miss.2004)). The United States Supreme Court has defined the- standard for competency to stand trial as: “whether [a defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding ... and whether he has a rational as well as factual understanding of the proceedings against him.” Hearn, 3 So.3d at 728 (¶ 15) (quoting Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)). To be deemed competent to stand trial,, the Court has held that the defendant must be one:
(1) who is able to perceive and understand the nature of the proceedings; (2) who is able to rationally communicate with his attorney about the case; (3) who is able to recall relevant facts; (4) who is able to testify in his own defense if appropriate; and (5) whose ability to satisfy the foregoing criteria is commensurate with the severity of the case.
Hearn, 3 So.3d at 728 (¶ 15) (quoting Martin, 871 So.2d at 697).
¶ 17. Prior to trial, the circuit judge granted Dickerson’s request for a mental evaluation. At a competency hearing, the court heard testimony from three doctors who had evaluated Dickerson. After hearing the expert testimony and’ considering *16 their reports, the trial judge held that Dickerson was competent to stand trial. Dickerson now argues that the trial court’s finding was against the overwhelming weight of the evidence and not supported by the expert testimony. He asserts that the trial court failed to consider the Hearn competency criteria in light of the heightened severity of his capital murder prosecution. See Hearn, 3 So.3d at 728 (¶ 15). He also asserts that the experts erroneously excluded Dickerson’s schizotypal personality disorder from their competency evaluation.
¶ 18. At the competency hearing,- Dr. Lott, a forensic psychologist, testified that he had evaluated Dickerson, and he opined that Dickerson “has the capacity to confer with his attorney although he appears to remain uncooperative.” He testified that, when he first evaluated Dickerson, Dickerson, reported several psychotic symptoms, but Dr. Lott did not see -the symptoms himself, so he referred Dickerson to the State Hospital. Dr. Lott explained that someone with a psychotic disorder can go through times of normalcy between psychotic episodes. Dickerson was evaluated at the State Hospital for two months.
¶ 19. In his first report, Dri Lott opined that Dickerson had a factual understanding of the charges against him, but that he lacked the capacity to confer rationally with counsel. However, after doctors from the State Hospital “described his behavior as being atypical and not consistent with a genuine mental illness,” Dr. Lott concluded that Dickerson was competent and “capable of making a rational and factual assessment of his legal situation and proceeding rationally with his attorney.” As to Dickerson’s ability to consult with counsel, Lott opined that Dickerson understood what his lawyers would do.
¶ 20. Dr. Lott testified that’he also had evaluated Dickerson in an unrelated 1-997 matter and had recommended that Dickerson’s mental health be monitored at that time. He discussed Dickerson’s mental health treatment, including diagnoses of paranoid Schizophrenia, major depressive disorder, and personality disorders with narcissistic features. Dr. Lott explained that Dickerson had received inpatient and outpatient treatment, was prescribed anti-psychotic medications, and had a history of noncompliance with treatment. Dr. Lott discovered that Dickerson had some academic difficulties as a child, but that he had reached the tenth grade. He noted that Dickerson’s childhood lacked major behavioral problems but explained that - Dickerson was described “as odd and as a loner.” He found that Dickerson’s behavior became increasingly odd and less independent over time. He also described un: dated letters Dickerson authored, which appeared disjointed and incoherent.
¶21. Dr. Lott discussed Dickerson’s test results and noted that, while Dickerson gave fluid answers, he questioned the validity of Dickerson’s score on a personality test. He testified that Dickerson had an adjusted full scale IQ of 71 but that he did not possess adaptive functioning deficits. He did find that Dickerson had a cognitive disorder. That disorder was evidenced by Dickerson’s deficits in executive function, which is'a person’s ability to anticipate, problem-solve, and understand delayed gratification. The deficits inhibit one’s ability to anticipate consequences, learn from -mistakes, and respond in a rational and non-impulsive manner.
¶ 22. Dr. Robert Storer, also a forensic psychologist, testified next. Dr. Storer had evaluated Dickerson for competency, arid he concluded that Dickerson did not suffer from any competency-related deficits. He acknowledged some risk factors for post-traumatic stress disorder (PTSD), but he explained that they were unable to *17 test Dickerson for PTSD because he would not cooperate. He noted that Dickerson demonstrated anger and irritation during his hospitalization. Dr. Storer described Dickerson’s diagnosis as “number one, malingering; number two, reported history of abuse as a child as a victim'; Axis II, there was personality disorder and not otherwise specified with schizotypal paranoid and narcissistic features.”
¶23. Finally, Dr. Reb McMichael, a forensic psychiatrist, testified. He likewise had examined Dickerson for the competency hearing. He agreed with Dr. Storer that Dickerson has a personality disorder, but he found Dickerson competent to stand trial. Dr. McMichael acknowledged the possibility that Dickerson has a major mental disorder that could affect his competence, but he saw no objective evidence of that during Dickerson’s two-month stay at the hospital. He noted a lack of signs of PTSD but explained that Dickerson’s lack of cooperation prevented the discovery of reliable data. After hearing the evidence, the circuit judge found Dickerson competent to stand trial.
¶24. Dickerson argues that the first four competency criteria were not considered in light of the heightened severity of a capital murder prosecution. In light of the expert testimony, we cannot agree. While the first four criteria require specific findings about what the defendant can do, the fifth criterion sets the bar that the defendant’s satisfaction of the first four prongs must be commensurate with the severity of the case. The experts found that Dickerson suffered from no competency-related deficits, and nothing in their testimony indicates that the experts failed to view a capital murder proceeding as one of significant severity. Likewise, there is no indication that the trial judge failed to consider the evidence commensurate with the severity of the case.
¶25. Dickerson also asserts that the experts erroneously excluded his schizo-typal personality disorder from their competency evaluation. Against, we cannot agree. • The transcript reflects that the experts considered Dickerson’s past history of mental illness and found that Dickerson’s condition did not affect his competency.. The circuit judge’s holding that Dickerson was competent to stand trial was supported ■ by the expert testimony and was not manifestly against the overwhelming weight of the evidence. The issue is without merit.
B. Mental Illness
¶ 26. Dickerson also contends in the alternative that, even if he was competent to stand trial, his history of mental illness precludes imposition of the death penalty. He likens the mentally ill to the mentally retarded and to • juveniles, who have “diminished personal culpability,” and who are constitutionally ineligible for the death penalty under Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), respectively. Dickerson asks the Court to hold that mentally ill defendants are exempt from the death penalty. The State responds that the Court should not extend Atkins and Roper to those with mental illness, because the Supreme Court has not held that mental illness renders a criminal ineligible for the death penalty.
¶27. The Eighth Amendment to the United States Constitution prohibits the infliction of “cruel and unusual punishment.” In Atkins v. Virginia, the United States Supreme Court addressed whether the execution of mentally retarded individuals violated the Eighth Amendment and held that the death penalty was “not a suitable punishment for a mentally retarded criminal.” Atkins, 536 U.S. at 321, 122 S.Ct. 2242. Three years later, in Roper v. *18 Simmons, the Supreme Court held that the death penalty is a disproportionate punishment for those who were under age eighteen when their crime was committed. Roper, 543 U.S. at 575, 125 S.Ct. 1183. In both cases, the Supreme Court held that the penological justifications for the death penalty-retribution and deterrence-were not served by the execution of the mentally retarded or juveniles because those offenders had diminished culpability. Roper, 543 U.S. at 551, 125 S.Ct. 1183; Atkins, 536 U.S. at 318-19, 122 S.Ct. 2242.
¶ 28. Dickerson now seeks to have this Court extend Atkins and Roper to preclude the death penalty for the mentally ill. The Fifth Circuit has rejected this argument repeatedly. See Ripkowski v. Thaler, 438 Fed.Appx. 296, 303 (5th Cir.2011) (“[T]he Fifth Circuit has recognized the distinction between the mentally ill and the mentally retarded and has held that Atkins only protects the latter.”); In re Neville, 440 F.3d 220, 221 (5th Cir.2006) (Defendant claimed that Atkins and Roper “created a new rule of constitutional law ... making the execution of mentally ill persons unconstitutional.” The Fifth Circuit held that “[n]o such rule of constitutional law was created, however, by either Atkins or Roper.”); In re Woods, 155 Fed. Appx. 132, 136 (5th Cir.2005) (“Atkins did not cover mental illness separate and apart from mental retardationf.]”).
¶ 29. Roper exempted juvenile offenders from the death penalty, and Atkins exempted the mentally retarded. Dickerson is neither under eighteen nor mentally retarded. Therefore, he is not exempt from the death penalty under Atkins or Roper. We will not extend those cases to apply to the mentally ill when “[t]he Supreme Court has never held that mental illness removes a defendant from the class of persons who are constitutionally eligible for a death sentence.” Ripkowski, 438 Fed.Appx. at 303. We cannot take the Atkins opinion-which was so specific to mental retardation that the Court cited and discussed the clinical definition of mental retardation-and apply it to all other mental disorders. To do so would be no different than taking Roper and expanding it to preclude execution of criminals under age twenty-one, rather than age eighteen as the Supreme Court explicitly held. Dickerson’s alternative argument that the death penalty cannot be imposed on the mentally ill is without merit.
II. Whether the trial court erred in failing to quash the arson indictment and in permitting the arson count to go to the jury.
¶ 30. The indictment charged Dickerson with first-degree arson of a dwelling. Dickerson challenged the sufficiency of the indictment in a pretrial motion, which the trial court denied. When the State rested, Dickerson again challenged the sufficiency of the indictment as well as the sufficiency of the evidence to prove arson through a motion for directed verdict. The trial court denied the motion, finding sufficient evidence to send the count to the jury.
A. Sufficiency of the Indictment
¶ 31. Dickerson claims that the indictment for arson was insufficient. He asserts that, to be sufficient, “the indictment must allege and the evidence must establish beyond a reasonable doubt, inter alia, that the defendant set the fire and did so with the requisite intent to arson property.” Dickerson writes that if the evidence does not support the charge, the indictment is insufficient. Dickerson seemingly confuses his sufficiency of the evidence claim with sufficiency of the indictment. Proof of the crime beyond a reasonable doubt need not be set forth in an indictment. We review the sufficiency of an indictment de novo. Hardy v. State, *19 137 So.3d 289, 301 (¶ 43) (Miss.2014) (quoting Young v. State, 119 So.3d 309, 313 (¶ 10) (Miss.2013)).
¶ 32. Count Two of the indictment against.Dickerson charged him with first-degree arson. The heading on the indictment read: “Indictment for the offense of capital murder, arson, and armed robbery.” Count Two provided:
and that on or about the 25th day of January, 2011, in Copiah County, Mississippi, and within the jurisdiction of this court, the said David Dickerson did wil-fully, unlawfully, feloniously and maliciously set fire to that certain dwelling owned and occupied by Linda Austin, contrary to and in violation of Section 97-17-1 of the Mississippi Code of 1972, and against the peace and dignity of the State of Mississippi.
Mississippi Code Section 97-17-1, under which Dickerson was charged, provides:
Any person who willfully and maliciously sets fire to or burns or causes to be burned or who aids, counsels or procures the burning of any dwelling house, whether occupied, unoccupied or vacant ... shall be guilty of arson in the first degree, and upon conviction thereof, be sentenced to the penitentiary for not less than five (5) nor more than twenty (20) years and shall pay restitution for any damage caused.
Miss.Code Ann. § 97-17-1(1) (Rev.2014).
¶ 33. To be sufficient, an indictment must include: “(1) the essential elements of the crime charged, (2) sufficient facts to fairly inform the defendant of the charge which he must defend, and (3) sufficient facts to enable him to plead double jeopardy in the event of a future prosecution for the same offense.” Hardy, 137 So.3d at 301 (¶ 43) (quoting Young, 119 So.3d at 313 (¶ 11)). Dickerson’s indictment charged that he “wilfully, unlawfully, feloniously and maliciously set fire to that certain dwelling owned and occupied by Linda Austin, contrary to and in violation of Section 97-17-1.” The indictment covered the elements of the crime of first degree arson-(l) a person willfully and maliciously (2) sets fire to, burns, or causes to be burned (3) a dwelling house. The indictment included sufficient facts to inform Dickerson of the charge because it clearly set forth the required elements of the crime, identified the code section violated, and identified the crime as arson. Finally, by identifying the date of the alleged crime and the owner of the house, the indictment included sufficient facts that would enable Dickerson “to plead double jeopardy in the event of a future prosecution for the same offense.” Hardy, 137 So.3d at 301 (¶ 43). The indictment was sufficient, and the trial court did not err by denying Dickerson’s pretrial motion to quash or his later challenges to the sufficiency of the indictment.
B. Sufficiency of the Evidence
 ¶ 34. Dickerson claims that the evidence presented at trial was insufficient to prove that he actually set the fire to and intended to burn the trailer. He claims that his pouring gasoline on Paula' was merely part of his assault, but that there is no evidence to prove that it was done with the intent to set the trailer on fire. When considering the sufficiency of the evidence, the Court views the evidence in the light most favorable to the State, gives the State the benefit of all reasonable inferences drawn from the evidence, and asks “whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Conner v. State, 138 So.3d 143, 148(7) (Miss.2014) (internal citations omitted).
¶ 35. To prove first-degree arson, the State must prove that the burning of a dwelling house was willful and malicious.
*20 Miss.Co.de Ann, § 97-17-1 (Rev.2014). An arson is willful when the fire is intentionally set, and malice is inferred from willfulness. See Isaac v. State, 645 So.2d 903, 908 (Miss.1994); Barnes v. State, 721 So.2d 1130, 1134 (Miss.Ct.App.1998). That the dwelling house of Linda Austin burned is not disputed. The only question is whether Dickerson set it on fire intentionally. While no witness observed Dickerson set the fire, the witnesses testified that Dickerson poured gasoline on Paula and around the trailer and that the trailer burst into flames. The pastors who saw the burning trailer and stopped to help saw a man standing near the trailer watching it burn. A reasonable juror could infer that Dickerson intentionally started the fire based on his violent attack on Paula, his pouring gasoline on her and throughout the inside of the trailer, and his presence as the trailer burst in flames with Paula inside. The State presented sufficient evidence to prove arson.
¶ 36. Dickerson’s claims that the arson indictment was insufficient and that the evidence was insufficient to prove arson are without merit.
III. Whether reversal is required due to the erroneous admission of inflammatory and prejudicial evidence at the culpability phase of trial,
¶ 37. Dickerson contends that the circuit judge erred by admitting inflammatory and prejudicial evidence, at trial-sper cifically, a 911 call, color autopsy photographs, and prior bad acts evidence. We review a circuit judge’s decision to admit or exclude evidence for an abuse of discretion. Cole v. State, 126 So.3d 880, 883 (Miss.2013) (citing Haggerty v. Foster, 838 So.2d 948, 958 (Miss.2002)).
A. 911 Call
¶ 38. The State entered into evidence the recording of the 911 call made by Kayla during the attack. Dickerson objected, claiming that the recording was hearsay and not relevant. The trial judge allowed the call to be admitted, holding that it satisfied the present sense impression exception to the hearsay rule. Dickerson claims that the trial judge erred because the call is not relevant and cannot survive the balancing test of Mississippi Rule of Evidence 403. He claims that, because the call consists of undifferentiated screaming, it possesses little probative value and is inherently prejudicial.
¶ 39. The 911 call played for the jury lasts approximately two minutes. The call mostly consists of unintelligible background noise and screaming and the operator encouraging the caller to speak. Ten seconds into the call, someone screams “David!” About a minute later, Kayla provides an address. Near the end of the call, Kayla says that she saw someone outside, that her mother went to see what he was doing, and that he had a gun.
¶ 40. Evidence is relevant if it has “any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” Miss. R. Evid. 401. Even if evidence is relevant, the circuit judge may exclude it “if its probative value is substantially outweighed by the danger of unfair prejudice[.]” ■ Miss: R. Evid. 403. The reference to “David” has a tendency to establish identity, and the caller’s statement that her mother went outside to confront a man with a gun has a tendency to explain the course of events. Thus, the call is relevant under Rule 401. Further, the probative value is not substantially outweighed by ■ any unfair prejudice, because the call’s lack of substance diminish- *21 ¶ 40. Evidence is relevant if it has “any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” Miss. R. Evid. 401. Even if evidence is relevant, the circuit judge may exclude it “if its probative value is substantially outweighed by the danger of unfair prejudice[.]” ■ Miss: R. Evid. 403. The reference to “David” has a tendency to establish identity, and the caller’s statement that her mother went outside to confront a man with a gun has a tendency to explain the course of events. Thus, the call is relevant under Rule 401. Further, the probative value is not substantially outweighed by ■ any unfair prejudice, because the call’s lack of substance diminish-
B. Autopsy Photographs
¶41. The State’s pathologist identified two color photographs of Paula’s gunshot wounds, which were entered in evidence over Dickerson’s objection that black and white copies would provide the same probative value with less unfair prejudice. Dickerson now argues that the circuit judge erred because he did not force the State to accept his proposed stipulation on cause and manner of death, obviating the need for autopsy evidence, and because he overruled his objection that black and white versions would have provided the same probative value.
¶ 42. The “admission of photographs into evidence is within the discretion of the trial judge, and such admission will be upheld on appeal absent a showing of an abuse of that discretion^]” Sudduth v. State, 562 So.2d 67, 70 (Miss.1990) (citing Davis v. State, 551 So.2d 165, 173 (Miss.1989)). Relevant photographs may be admitted despite “the mere fact that they are unpleasant or gruesome[.]” ' Sudduth, 562 So.2d at 70 (citing Davis, 551 So.2d at 173; Boyd v. State, 523 So.2d 1037, 1040 (Miss.1988)).
¶ 43. Before trial, Dickerson offered to stipulate the following: “Paula Hamilton, was killed on January 25, 2011, in Copiah County, Mississippi, ' by two gunshot wounds.” Dickerson separately offered to stipulate to the decedent’s identity. Each offer asked the circuit judge to order the State to accept the stipulation and made clear that the intent behind the stipulation was to prevent the presentation of potentially inflammatory evidence. The circuit judge refused to require the State to stipulate anything.
¶ 44. Dickerson argues that “photographs' of the victim should not ordinarily be admitted into evidence where the killing is not contradicted or denied, and the corpus delicti and the identity of the deceased have been established.” Sudduth, 562 So.2d at 70 (citing Davis, 551 So.2d at 173). He also cites State v. Lindsey, in which the Louisiana Supreme Court found that a “stipulation to. the matter sought to be proved by the photographs necessarily bears upon a balancing of the probative value of the photographs against their prejudicial effect.” State v. Lindsey, 404 So.2d 466, 475 (La.1981) (citing State v. Landry, 388 So.2d. 699 (La.1980); State v. Gilmore, 332 So.2d 789 (La.1976)). However, the Lindsey Court went on to write that “the state cannot be robbed of the fair and legitimate moral • force of its case merely because the stipulation is offered.” Lindsey, 404 So.2d at 475 (citing State v. Harvey, 358 So.2d 1224 (La.1978); Gilmore, 332 So.2d at 789).
¶ 45. Dickersonis stipulations would not have obviated all of the probative value of the photographs. Though he offered to stipulate that Paula was killed by gunshot, Dickerson did not offer to stipulate that she was shot intentionally. The gruesome nature of Paula’s injuries, shown in the photographs, had some probative value to show that intent. Likewise, the circuit judge concluded that the color photographs provided greater probative value than the black and white versions. While the black and white photograph in the record is relatively clear, it does not reflect the burns Paula suffered. We cannot say the judge abused his discretion in allowing the color autopsy photographs to be admitted.
*22 C. Prior Bad Acts Evidence
¶ 46. Dickerson contends that the circuit judge erred by admitting evidence of stalking charges and a protective order against him. Dickerson filed a motion in limine under Mississippi Rules of Evidence 403 and 404 to exclude any prior bad acts evidence the State intended to use. That motion was discussed briefly in a pretrial hearing in which Dickerson’s counsel did not ask the circuit judge to rule on his motion at that time, but asked only for an opportunity to object before any prior bad acts evidence was admitted at trial. At that time, the State made known its intent to introduce evidence of a court date in an adversarial proceeding involving Paula and Dickerson on the day of the murder.
¶ 47. At trial, the State called Carolyn Morgan, Justice Court Clerk for Copiah County at the time of the murder. She testified that she had mailed Dickerson a notice to appear for a hearing on the day of the murder and that she confirmed that Dickerson knew of the hearing by phone the day before. Morgan also identified a protective order relating to domestic abuse that was filed by the victim against Dickerson and signed by a judge on October 12, 2010. No contemporaneous objection was lodged. On cross-examination, Morgan testified that the protective order also was filed by Dickerson’s daughter, Courtney; that it indicated no weapons were used in the domestic abuse; and that it prohibited contact between Dickerson and the petitioners.
¶ 48. On redirect, Morgan clarified that both Paula Hamilton and Courtney Dickerson were protected by the order. The State then clarified that the October 2010 order was only temporary in nature and asked if it related to the hearing set for the day of the murder. Morgan responded that it was temporary, but that it did not relate to the scheduled hearing. At that point the State excused the witness and Dickerson’s counsel asked to approach the bench. There, Dickerson’s counsel expressed concern that the jury had heard evidence of an unrelated incident. Both Dickerson’s counsel and the State stated that they believed Morgan would testify that the October order did relate to the January hearing. After the judge commented that the witness was gone and there was nothing he could do, Dickerson’s counsel moved for a mistrial.
¶ 49. Defense counsel explained that the State had informed them of its intent to use the October 2010 protective order, but it had led defense counsel to believe it was the same matter to be addressed in the hearing on the day of the murder, and that the order was therefore relevant to the prosecution. But now, based on Morgan’s testimony, it appeared that the October order related to other, irrelevant prior acts. The judge then explained that Dickerson’s counsel had made no contemporaneous objection for him to rule on. The State then offered to recall Morgan in order to clarify her testimony, to which Dickerson’s counsel agreed, saying that would take care of the objection. The State then proffered Morgan’s further testimony. She explained that the hearing on the day of the murder was to adjudicate the criminal stalking charges related to the October 2010 protective order. Dickerson’s counsel then expressed that they had no objection to the proffered clarification, and Morgan testified to the clarification in front of the jury without objection or cross-examination from Dickerson’s counsel.
¶ 50. Generally, failure to lodge a contemporaneous objection to the admission of evidence waives the issue on appeal; the contemporaneous objection requirement is not diminished in death penalty cases. Williams v. State, 684 So.2d *23 1179, 1189 (Miss.1996); Cole v. State, 525 So.2d 365, 369 (Miss.1987). Though Dickerson moved to exclude the prior bad acts evidence, his counsel withdrew the objection after the State presented Morgan’s clarified testimony; Dickerson’s counsel forfeited the issue for appeal. While the rule does not eliminate the Court’s authority to recognize plain error, the circuit judge’s admission of the evidence cannot constitute plain error because Mississippi Rule of Evidence 404(b) allows the admission of prior bad acts evidence for purposes other than propensity, such as motive. Miss. R. Evid. 103(d), 404(b). The fact that Dickerson was to appear in court on the day of the murder to face a criminal stalking charge — by which he was alleged to have stalked the murder victim — certainly provided motive for the crime. The trial court did not err in admitting evidence of the stalking charge and protective order.
IY. Whether the trial court erred by refusing Dickerson’s requested penalty phase instruction regarding his Atkins intellectual disability defense.
¶ 51. In Atkins v. Virginia, the United States Supreme Court ruled that the Eighth Amendment’s ban of cruel and unusual punishment categorically prohibits the execution of the mentally retarded.[2] Then the Court left “to the States the task of developing appropriate ways to enforce the constitutional restriction” against the execution of mentally retarded offenders. Atkins, 536 U.S. at 317, 122 S.Ct. 2242 (quoting Ford v. Wainwright, 477 U.S. 399, 416-17, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)). In Chase v. State, 873 So.2d 1013 (Miss.2004), the Court took on the task of “developing appropriate ways to enforce” the prohibition of execution of mentally retarded offenders. The Court has since applied Atkins and Chase more than two dozen times.
'The standards, definitions, and procedure for making a determination of mental retardation were provided by this Court in Chase v. State. A defendant must prove that he meets the standard for mental retardation by a preponderance of the evidence. Chase, 873 So.2d at 1028 (quoting Foster v. State, 848 So.2d 172, 175 (Miss.2003)). The circuit court, sitting without a jury, will consider and decide whether the defendant is mentally retarded. Id.
This Court in Chase adopted the clinical definition of mental retardation set forth by the Supreme Court in Atkins. “Mental retardation refers to substantial limitations in present functioning.” Chase, 873 So.2d at 1027 (quoting Atkins, 536 U.S. at 308 n. 3, 122 S.Ct. 2242, 153 L.Ed.2d 335). According to the AAMR, mental retardation is characterized by: (1) “significantly subaverage intellectual functioning,” (2) “existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, community use, self-direction, health and safety, functional academics, leisure, and work,” (3) which “manifests before age 18.” Id. The definition of mental retardation from the APA is almost identical.
Persons with an IQ of 50-55 to 70 typically are described as having “mild mental retardation,” but “mental retardation may, under certain conditions, be present in an individual with an IQ of up to 75.” Chase, 873 So.2d at 1028 (quoting *24 Atkins, 536 U.S. at 308 n. 3, 122 S.Ct. 2242, 153 L.Ed.2d 335). This Court has said that the Minnesota Multiphasic Personality Inventory-II (MMPI-II) should be administered, because “its associated validity scales make the test best suited to detect malingering.” Chase, 873 So.2d at 1028 (quoting Foster, 848 So.2d at 175). In addition to the MMPI-II, •experts should use “any other tests and procedures permitted under the Mississippi Rules of Evidence, and deemed necessary to assist the expert and the trial court in forming an opinion as to whether the defendant is malingering.” Chase, 873 So.2d at 1028 n. 19. See also Lynch v. State, 951 So.2d 549, 557 (Miss.2007) (trial courts are free to use any approved test to determine mental retardation and/or malingering).
Goodin v. State, 102 So.3d 1102, 1112-13 (¶ 31-34) (Miss.2012).
¶ 52. Prior to trial, Dickerson filed a motion for a mental evaluation to determine competency to stand trial and intellectual disability. The court granted the motion, Dickerson was evaluated, a hearing was held, and three experts testified that Dickerson was not mentally retarded. At trial, Dickerson sought to submit to the jury the issue of whether he was intellectually disabled. He submitted a jury instruction that set forth the Atkins criteria for. establishing mental retardation and directed the jury to cease deliberations if it determined that the evidence established that the Atkins criteria were met. The trial court refused the instruction. Dickerson now claims that he should have been allowed to submit that issue to the jury. He asserts that a defendant is allowed to have all theories of defense presented to the jury. Dickerson also contends that the United States Constitution mandates the jury’s consideration of the Chase criteria. In the alternative, Dickerson claims that the jury was not adequately instructed to consider his intellectual capacity as a mitigating factor in the absence of a finding • that he was mentally retarded.
¶ 53. Although the Court has held that the determination of whether the defendant is mentally retarded is to be made by the circuit court sitting without a jury, Goodin, 102 So.3d at 1112 (¶31) (citing Chase, 873 So.2d at 1028 (¶ 71)), for purposes of today’s case we do not revisit that holding and address whether he would be entitled to have any Atkins issues presented to the jury, as he produced no evidence to support the giving of such an instruction. Dickerson was evaluated for mental retardation prior to trial, and three experts concluded that Dickerson was not mentally retarded. Further, as discussed under Issue I above, because Atkins exempts only the mentally retarded from execution, not the mentally ill, and there is no evidence in the record indicating that Dickerson is mentally retarded, Atkins is inapplicable to Dickerson’s case.
¶ 54. Dickerson’s argument that due process requires that' he be allowed to present his intellectual disability theory of defense to the jury is without merit. Defendants are entitled to have their defense theories submitted to the jury, but that right is not unlimited; for a jury instruction to be given it must be supported by the evidence presented. Hardy v. State, 137 So.3d at 302 (¶ 49) (quoting Austin v. State, 784 So.2d 186, 192 (Miss.2001)). Dickerson’s requested instruction regarding mental retardation was not supported by the evidence. In Chase, establishing the procedure for reaching a determination of mental retardation, the Court wrote:
We hold that no defendant may be adjudged mentally retarded for purposes of the Eighth Amendment, unless such defendant produces, at a minimum, an *25 expert who expresses an opinion, to a reasonable degree of certainty, that:
1. The defendant is mentally retarded, as that term is defined by the American Association on Mental Retardation and/or The American Psychiatric Association;
2. The defendant has completed the Minnesota Multi phasic Personality Inventory-II (MMPI-II) and/or other similar tests, and the defendant is not malingering.
Chase v. State, 873 So.2d at 1029 (¶ 74). No expert opined that Dickerson is mentally retarded. In fact, the experts concluded that Dickerson was not, and Dick-' erson offered no evidence to the contrary. Because no expert opined that Dickerson met the definition of mental retardation to a reasonable degree of certainty, as a matter of law, the jury could not find that Dickerson was mentally retarded and exempt from execution. The trial judge did not err' in denying the jury instruction because evidence presented was legally insufficient to support a finding of mental retardation.
¶ 55. Finally, Dickerson’s alternative argument that the jury was not adequately instructed to consider his intellectual capacity as a mitigating factor in the absence of a finding that he was mentally retarded is without merit. Sentencing instruction D-12, which the circuit judge granted, told the jury that it could consider as mitigating evidence that Dickerson suffers from mental illness, suffers from brain damage, and has an IQ score in the mentally retarded range among other enumerated mitigating factors. That instruction also told the jury it could consider any other factors it found to be mitigating. The jury received sufficient instruction regarding consideration of Dickerson’s diminished mental capacity in mitigation.
V. Whether the trial court exacerbated the error and prejudice at the sentencing phase by refusing Dickerson’s other proposed penalty phase instructions.
¶ 56, Dickerson argues that the circuit judge ferred by denying his proposed sentencing phase instruction D-ll, which explained what would happen if the jury could not unanimously agree on a sentence. Proposed instruction D-ll read: “The Court instructs the jury that if you cannot, within a reasonable time, agree as to punishment, the Court will dismiss you and impose a sentence of imprisonment for life without the benefit of parole.” The State contends that the issue is barred because Dickerson did not object contemporaneously to the circuit judge’s denial of his proposed instruction. The State also argues that the Court repeatedly has concluded that the sentencing jury need hot receive similar instructions.
¶ 57. “It is well established that when error is predicated upon the denial of a jury instruction requested by the defendant, the defendant need not make a contemporaneous objection to the denial in order to preserve the error for appeal.” Neal v. State, 15 So.3d 388, 408 (¶ 50) (Miss.2009) (citing Green v. State, 884 So.2d 733, 736 (Miss.2004)). Errors pertaining to the refusal of jury instructions are “procedurally preserved by the mere tendering of the instructions, suggesting that they are correct and asking the Court to submit them to the jury.” Neal, 15 So.3d at 408 (¶ 50) (quoting Rubenstein v. State, 941 So.2d 735, 789 (Miss.2006) (quoting Edwards v. State, 737 So.2d 275, 310 (Miss.1999))). Dickerson’s argument is not procedurally barred for his failure to make a contemporaneous objection.
*26 ¶ 58. The giving of a jury instruction is “within the sound discretion of the trial court.” Flowers v. State, 158 So.3d 1009, 1062 (¶ 128) (Miss.2014) (quoting Gillett v. State, 56 So.3d 469, 496 (¶ 67) (Miss.2010) (quoting Rubenstein, 941 So.2d at 787 (¶ 239))). When reviewing errors related to jury instructions:
This Court does not single out any instruction or take instructions out of context; rather, the instructions are to be read together as a whole. Thomas v. State, 818 So.2d 335, 349 (Miss.2002). A defendant is entitled to have jury instructions which present his theory of the case. Id. This entitlement is limited, however, in that the court is allowed to refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence. Id.
Flowers, 158 So.3d at 1062 (¶ 128) (quoting Gillett, 56 So.3d at 496 (¶ 67) (quoting Walker v. State, 913 So.2d 198, 234 (¶ 132) (Miss.2005))).
¶ 59. In Gillett v. State, we addressed the circuit judge’s refusal to grant a nearly identical instruction. The proffered instruction in Gillett read: “If you cannot, within a reasonable time, agree as to punishment, I will dismiss you and impose a sentence of life without the benefit of parole. If you cannot agree, know that any of you may inform the bailiff of this.” Gillett, 56 So.3d at 515 (¶ 138). The Court found no error because the sentencing instructions given adequately informed the jurors of the three outcomes they could reach: a unanimous sentence of death, a unanimous sentence of life, or that they were unable to reach a unanimous sentence. Id. at 516 (¶ 140) (citing Edwards, 737 So.2d at 316-17 (in which a similar instruction was refused)). Because the instructions in Gillett informed the jurors that they could return without an unanimous sentence, the jury did not need to know what would happen in that event. Id.[3] The United States Supreme Court has held that the Eighth Amendment does not require an instruction on the sentence imposed if the jury does not reach a unanimous sentence in a capital murder trial. Jones v. United States, 527 U.S. 373, 381-82, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999). As in Gillett, the instructions granted in the instant case informed the jury of all three options, and the circuit judge did not err by denying Dickerson’s proposed instruction D-ll.
VI. Whether the trial court erred in not entering a life sentence when the jury returned a sentencing . verdict that failed to find any aggravating circumstances.
¶ 60. The jury deliberated for more than an hour and a half before returning with a unanimous sentencing verdict, which the clerk read aloud. The verdict found beyond a reasonable doubt that:
The defendant actually killed Paula Hamilton, that the defendant attempted to kill’ Paula Hamilton, that the defendant intended that the killing of Paula Hamilton take place, and that the defendant contemplated that lethal' force would be employed, and is all sufficient to impose the death penalty, and that *27 there are insufficient mitigating circumstances to outweigh the aggravating circumstances, and we further find unanimously that the defendant should suffer death.
Recognizing that the verdict failed to reflect whether the jury found the existence of any statutory aggravating factor, the judge asked counsel to approach the bench. The following exchange occurred:
THE COURT: There are no aggravating circumstances listed. The verdict form did say that if there were insufficient mitigating circumstances to outweigh the aggravating circumstances. Don’t those need to be listed?
MR. DeGRUY: Without aggravating circumstances?
THE COURT: Do I need to instruct the jury to return and reform the verdict to comply with the Instruction Number 2?
MR. DeGRUY: We would like for a verdict of life since there were no findings.
The circuit judge then instructed the jury to return to the jury room, look at the instructions, and reform their verdict to comply with those instructions.
¶ 61. When the jury had been deliberating the second time for twenty minutes, the following exchange occurred:
MR. DeGRUY:' Your Honor, just to continue in making the record, the jury has now been in the back jury room for over 20 minutes.
THE COURT: I don’t know how long they’ve been back there. They’ve been back there for a while.
MR. DeGRUY: It appeal’s they’re confused by the instruction. They possibly found nonstatutory aggravators, which was not proper. The fact that they did not return a finding beyond — of any aggravating factors as of yet — we’ve now been in deliberations almost two hours. That is a reasonable time passed, and we ask that the judge dismiss the jury and impose a life sentence.
THE COURT: Well, I appreciate your request, Counsel. I understand the request. However, the jury has been back — I don’t know how long they were out originally, but they have returned a verdict that was not in proper form. They’ve been back a few minutes. I’m not sure how long they’ve been back. And there very well may be that there was confusion as to Jury Instruction Number 2, the Court’s Instruction Number 2, without knowing that unless the jury brings back in a comment on the extent of the confusion, if any. However, the Court will allow the jury to redo its verdict and bring that back in the proper form.
The jury then returned a corrected unanimous sentence, recommending the death penalty and finding the existence of two aggravating factors: that the murder was committed while Dickerson was engaged in the commission of a burglary and that the offense was especially heinous, atrocious, and cruel. Dickerson filed a motion for a new trial, which the trial court denied. Dickerson argues that the circuit judge was obligated to impose a life sentence when the jury returned the original verdict without finding any aggravating factors.
¶ 62. Mississippi Code Section 99-19-103 provides that “[t]he jury ... shall designate in writing, signed by the foreman of the jury, the statutory aggravating circumstance or circumstances which it unanimously found beyond a reasonable doubt. Unless at least one (1) of the statutory aggravated circumstances enumerated in Section 99-19-101 is so found ... the death penalty shall not be imposed.” Miss.Code Ann. § 99-19-103 (Rev.2007). Section 99-19-11 states that “[i]f the verdict is informal or defective the court may *28 direct it to be reformed at the bar.” Miss. Code Ann. § 99-19-11 (Rev.2007).
¶ 63. In the same way the jury is required to find the existence of at least one aggravating factor, the jury must also find that at least one Enmund factor exists. King v. State, 960 So.2d 413, 443 (Miss.2007) (citing Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); Miss.Code Ann. § 99-19-101(7) (Rev.2000)). In King v. State, the sentencing jury omitted any Enmund finding from its verdict sentencing the defendant to death. King, 960 So.2d at 443. The circuit judge instructed the jury that its verdict did not comport with the court’s instructions, directed their attention to the Enmund portion ■ of the- instructions, and sent the jury to deliberate further. Id. at 443-44. On appeal, King argued that the court’s instruction tainted the jury’s vei*-dict. Id. We disagreed’and affirmed the defendant’s death sentence because the instruction did not tell the jury that' it was required to find an Enmund factor. Id. at 444. Likewise, in the instant casé, the judge only instructed the jury to reform their verdict to comply with the given instructions. He did not instruct the jury to find aggravating factors. There is no evidence that the circuit judge’s instruction to reform the sentencing verdict tainted the jury’s ultimate conclusion.
¶ 64. Further, Section 99-19-11 specifically authorizes the judge to have the jury reform its verdict if the original verdict was defective. Miss.Code Ann. § 99-19-11 (Rev.2007). The jury’s original verdict did not contain an affirmative finding that no aggravating factor existed; in fact, it alluded to a finding that aggravating factors had been found by stating “that there are insufficient mitigating circumstances to outweigh’ the aggravating circumstances.” Thus; it seems that the jury’s error was a technical defect that could be reformed under the statute.
¶ 65. Dickerson also contends that the language referencing aggravating factors in the first sentencing verdict should be viewed as an indication that the jury considered non-statutory aggravating factors. He claims that the consideration of non-statutory factors is further evidenced by the fact that the original sentencing verdict found all four Enmund factors, while the reformed verdict found only one. Dickerson cites Holland v. State, 587 So.2d 848 (Miss.1991), where the Court reversed when the jury deliberated sentencing before the issue was submitted, and Dickerson contends that the judge’s reformation instruction created a similar problem in the instant case. In Holland, the jurors sent a note to the trial judge expressing that they had reached a unanimous sentence, but the judge had not yet submitted that issue to the jury. Holland, 587 So.2d at 872. Thus, the jurors’ error was definite. Here, Dickerson’s concerns aré merely speculative. While mentioning aggravating factors in the first sentencing verdict could refer to impermissible non-státutory factors, it just as easily could refer to statutory ones. The mere fact that the jury amended its Enmund findings seems to be of no consequence, as Dickerson has not cited any authority to say that a jury sent to reform its defective verdict may not conduct further substantive deliberations.
¶ 66. We hold that the circuit judge did not err by instructing the jury to reform its verdict.
VII. Whether the aggravating circumstances on which the jury was instructed were either legally or factually unsupported, rendering Dickerson’s death sentence invalid.
¶ 67. The jury was instructed to consider two statutory aggravating factors: *29 whether the capital offense was committed while the defendant was engaged in the commission of a burglary and whether the offense was especially heinous, atrocious, or cruel. See Miss.Code Ann. § 99-19-101(5)(d), (i) (Rev.2007). Dickerson claims that the aggravating factors were not legally or factually'supported and that, even if his conviction is affirmed, the matter must be remanded for resentencing. We review the trial court’s decision to allow or deny jury instructions for abuse of discretion. Gillett, 56 So.3d at 505 (¶ 105) (citing Rubenstein, 941 So.2d at 787).
A. Killing During the Commission of a Burglary .
¶ 68. Dickerson argues that the circuit judge erred by instructing the sentencing jury on the felony-murder aggravating factor because that same factor had been used in the guilt phase to elevate the killing to capital murder. Dickerson acknowledges that both the Mississippi Supreme Court and the United States Supreme Court have accepted the practice, but suggests those opinions are wrongly decided, and he argues that Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), compel a different result.
¶ 69. In Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), the United States -Supreme Court held that having the jury find aggravating circumstances serves to satisfy the Eighth Amendment’s dictate that capital murder statutes narrow the imposition of the death penalty to the most deserving offenders. Lowenfield, 484 U.S. at 244, 108 S.Ct. 546. The Supreme Court concluded that the jury can narrow the class of offenders in either the guilt or sentencing phase. Id. at 244-45, 108 S.Ct. 546. Relying on Low-enfield — and specifically rejecting nearly identical arguments in which the defendant relied on' Apprendi and Ring — the Court has repeatedly held that “evidence of the underlying crime can properly be used both to elevate the crime to capital murder and as an aggravating circumstance.” Gillett, 56 So.3d at 510 (¶ 119) (quoting Ross v. State, 954 So.2d 968, 1014 (¶ 106) (Miss.2007) (citing Bennett v. State, 933 So.2d 930, 954 (Miss.2006); Goodin v. State, 787 So.2d 639, 654 (Miss.2001); Smith v. State, 729 So.2d 1191, 1223 (Miss.1998); Bell v. State, 725 So.2d 836, 859 (Miss.1998))).[4]
B. Especially Heinous, Atrocious, or Cruel
¶70. Dickerson argues that the State presented insufficient evidence to support an instruction on the especially heinous, atrocious, or cruel aggravating factor because his mental capacity so affected his moral judgment that his actions could not be considered especially heinous, atrocious, or cruel. The State contends that his claim is procedurally barred because Dickerson did riot object to the instruction at trial. Dickerson admits that he failed to lodge a contemporaneous objection but suggests that the claim should be reviewed for plain error.
¶ 71. We apply the plain-error rule only if “a defendant’s substantive or fundamental rights are affected.” Foster v. State, 148 So.3d 1012, 1018 (¶ 20) (Miss.2014) (quoting Grayer v. State, 120 So.3d 964, 969 (Miss.2013)). Applying the plain-error rule, the Court must determine: (1) whether the trial court deviated from a legal rule; (2) whether the error is plain, *30 clear, or obvious; and (3) whether the error prejudiced the outcome of the trial. Id. Only if the error “resulted in a manifest miscarriage of justice” will reversal occur. Foster, 148 So.3d at 1018 (¶ 20) (quoting Williams v. State, 134 So.3d 732, 736 (Miss.2014)).
¶ 72. We have held that “ ‘[t]he number of wounds, the number of lethal weapons used to inflict these wounds, and the fact that death was not immediate, but prolonged’ may all be considered as evidence supporting a jury’s finding of the HAC aggravator.” Batiste v. State, 121 So.3d 808, 870 (¶ 172) (Miss.2013) (quoting King v. State, 960 So.2d 413, 441 (¶ 54) (Miss.2007) (quoting Manning v. State, 735 So.2d 323, 349 (¶ 64) (Miss.1999))). When evidence to that effect has been presented to the jury, the Court has affirmed the circuit judge’s decision to grant an instruction on the especially heinous, atrocious, and cruel aggravating factor. See, e.g., Batiste, 121 So.3d at 870 (¶ 172); King, 960 So.2d at 441 (¶ 54); Manning, 735 So.2d at 349-50 (¶ 64).
¶ 73. In the instant case, the State presented evidence that Paula suffered multiple gunshot wounds, multiple stab wounds, and significant burns in a drawn-out assault. Evidence was presented that Paula was still alive when the trailer was set on fire. Multiple weapons were used and multiple wounds were inflicted. There is no question that the evidence presented supported an especially heinous, atrocious, and cruel instruction. While the jury may have considered whether Dickerson’s mental health reduced his moral culpability, his mental status makes the crime no less heinous, atrocious, or cruel. The judge did not err in granting the instruction.
¶ 74. Dickerson also contends that the instant aggravating factor is unconstitutionally vague and overbroad. “This Court has recognized that the ‘especially heinous, atrocious or cruel’ aggravating circumstance, without limiting instruction, is unconstitutionally vague and, consequently, an invalid aggravating circumstance.” Brown v. State, 798 So.2d 481, 501 (¶ 44) (Miss.2001) (citations omitted). We have held that, at a minimum, the “instruction must define a ‘heinous, atrocious, or cruel’ offense as ‘a conscienceless or pitiless crime which is unnecessarily torturous to the victim.’ ” Batiste, 121 So.3d at 870 (¶ 171) (quoting King, 960 So.2d at 440 (¶ 52)). The United States Supreme Court has approved use of that language, holding that “this narrowing construction was not unconstitutionally vague.” King, 960 So.2d at 440 (¶ 52) (citing Bell v. Cone, 543 U.S. 447, 457-58, 125 S.Ct. 847, 160 L.Ed.2d 881 (2005)).
¶ 75. In the instant case, the especially heinous, atrocious, or cruel instruction given to the jury read:
The Court instructs the Jury that in considering whether the capital offense was especially heinous, atrocious or cruel; heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others. An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of capital murders-the conscienceless or pitiless crime which is unnecessarily tortuous to the victim. If you find evidence, beyond a reasonable doubt, that the defendant utilized a method of killing which caused serious mutilation, that there was dismemberment of the body prior to death, that the defendant inflicted physical or mental pain before death, that there was mental torture and aggravation before *31 death, or that a lingering or tortuous death was suffered by the victim then you may find this aggravating circumstance.
The instruction included the language approved in Bell v. Cone, that the offense must be “a conscienceless or pitiless crime which is unnecessarily torturous to the victim,” and went even further to define heinous, atrocious, and cruel and to include specific examples of what that type of behavior could look like. The instruction was not unconstitutionally vague or over-broad. Dickerson’s claim is without merit.
VIII. Whether Dickerson’s death sentence must be vacated because it was imposed in violated of the Constitution of the United States.
¶ 76. Dickerson argues that his death sentence must be vacated because of several constitutional errors, all of which render Mississippi’s sentencing scheme unconstitutional. He acknowledges that the Court and the United States Supreme Court have declined to adopt his contentions, but he urges the Court to overrule its prior decisions. We decline to do so.
A. Indictment
¶ 77. Dickerson claims that failure to include aggravating circumstances in the indictment renders the sentence unconstitutional. We have rejected the argument repeatedly. See, e.g., Batiste v. State, 121 So.3d 808, 871 (¶ 174-76) (Miss.2013); Gillett v. State, 56 So.3d 469, 510-11 (¶ 120) (Miss.2010); Goff v. State, 14 So.3d 625, 665 (¶ 173-75) (Miss.2009); Ross v. State, 954 So.2d 968, 1014 (¶ 106) (Miss.2007); Bennett v. State, 933 So.2d 930, 954 (¶ 83) (Miss.2006); Brown v. State, 890 So.2d 901, 918 (¶ 60-62) (Miss.2004). Alleged aggravating circumstances do not have to be included in an indictment.
A. Enmund Factors
¶ 78. Dickerson claims that Mississippi Code Section 99-19-101, under which he was sentenced, is unconstitutional under Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). Section 99-19-101 provides:
In order to return and impose a sentence of death the jury must make a written finding of one or more of the following:
(a) The defendant actually killed;
(b) The defendant attempted to kill;
(c) The defendant intended that a killing take place;
(d) The defendant contemplated that lethal force would be employed.
Miss.Code Ann. § 99-19-101(7) (Rev.2007). Dickerson writes that, under Enmund and Tison, for a defendant to be sentenced to death he must have actually killed, attempted to kill, or intended to kill the victim, and because Mississippi Code Section 99-19-101 adds a fourth basis, that the defendant “contemplated that lethal force would be employed,” Dickerson maintains that it is unconstitutional. The Court has rejected similar arguments and held that Section 99-19-101(7) is constitutional. See Batiste, 121 So.3d at 871-72 (¶ 178); Evans v. State, 725 So.2d 613, 684 (¶ 316) (Miss.1997).
¶ 79. Under Enmund and Tison, a defendant who participated in the commission of a felony, but did not actually kill or intend to kill the victim, cannot receive the death penalty. The Court summarized that line of cases and Mississippi’s application thereof in Evans v. State:
... In Enmund and Tison, the Supreme Court addressed the constitutionality of the death penalty for defendants who, *32 although involved in the commission of a felony, did not actually kill.. In En-mund, the Court reversed the death sentence, of a defendant who was the driver of the “getaway” car in an armed robbery. The robbery victims were murdered by Enmund’s accomplices after they resisted. Enmund was .convicted under Florida’s felony-murder rule and sentenced to death.
The United States. Supreme Court reversed because the Florida Supreme Court affirmed the death penalty ⅛ the absence of proof that Enmund killed or attempted to kill, and regardless of whether Enmund intended or contemplated that life would be taken. The Court stated:
Ennaund’s criminal culpability must be limited to his participation in the robbery, and his punishment must be tailored to his personal responsibility and moral guilt. Putting Enmund to death to avenge two killings that he did not commit and had no intention of committing or causing' does not measurably contribute to the retributive end of ensuring that the criminal gets his just deserts.
Enmund, 458 U.S. at 797, 102 S.Ct. at 3376-77.
In Tison v. Arizona, the Court held that the Eighth Amendment did not prohibit -the death penalty in the intermediate case of the defendant whose participation is major and whose mental state is one of reckléss indifference to human life. 481 U.S. at 150, 107 S.Ct. at 1684. In Enmund, the Court noted that only eight jurisdictions authorized the death penalty solely for participation in a robbery in which another robber takes life. 458 U.S. at 789, 102 S.Ct. at 3372. Mississippi was among these eight jurisdictions. Following Enmund v. Florida, Mississippi amended its capital sentencing scheme to require that a jury must find that the defendant actually killed, attempted to kill, intended that a killing take place, and/or contemplated that lethal force would be employed in order to return and impose a sentence of death. Ch. 429, Senate Bill No. 2699, 1983 General Laws of Mississippi. See Miss.Code Ann. . 99-19-101(7). In. Tison, the Court noted that Mississippi had modified the capital murder sentencing scheme following Enmund. Id. at 152, n. 4, 107 S.Ct. at 1685, n. 4. .
"Contrary to Evans’[s] assertion, Mississippi requires more than simple felony murder to sentence a defendant to death. Miss.Code Ann. § 99-19-101 allows a jury to consider as an aggravating circumstance the fact that a murder was committed while the defendant was engaged in the commission of felony. However, after Enmund and the amendments to our sentencing scheme, that fact alone is insufficient to impose the death penalty. Rather, a jury must find that the defendant actually killed, attempted to kill, intended that a killing take place, or contemplated, that lethal force would be employed in order to impose a death sentence. Our sentencing scheme, consistent with Tison, allows a jury to consider as a mitigating circumstance: that the defendant was an accomplice whose participation was relatively minor.
In light of Enmund and Tison, a critical review of our capital sentencing scheme reveals no constitutional, infirmities. Moreover, unlike the defendants in En-mund and Tison, Evans was a major participant in a felony-murder and actually killed his victim. There is no merit to this issue.
Evans, 725 Sb.2d at 683-84 (¶ 311-16). Notwithstanding the fact that the Court has rejected Dickerson’s argument and *33 held that Section 99-19-101(7) is constitutional, his claim is unfounded based on the facts of his case. Dickerson was the sole actor in Paula’s murder, not an unknowing participant in the underlying felony. Further, the jury found that Dickerson actually killed Paula, which certainly satisfies' Enmund. Dickerson’s argument is without merit.
C. Constitutionality of Capital Punishment Scheme
¶ 80. Next, Dickerson alleges that Mississippi’s death penalty statute is unconstitutional (1) because the Court fails to conduct proportionality review; (2) because it is applied in a discriminatory and irrational manner; (3) because the statutes are overbroad and vague; and (4) because the death penalty is allowed where the murder was committed during the course of, certain felonies, but not authorized in the case of simple murder, no matter how premeditated or atrocious. Dickerson failed to provide any data or citations to support his claim that the death penalty is imposed in a discriminatory and irrational manner. He did not cite any authority to support his allegation that the Court fails to conduct proportionality review of death sentences, and the allegation is simply unfounded. Thus, those issues are waived.
¶ 81. To support his claim that the death penalty statutes are overbroad and vague, Dickerson repeats his argument about the heinous, atrocious, or cruel ag-gravator. As discussed above, that argument is without merit. As to Dickerson’s claim that the Mississippi’s death penalty scheme is unconstitutional because it is allows the death penalty where the murder was committed during the course of certain felonies, but not authorized in the case of simple murder, no matter how premeditated or atrocious, the Court has rejected the identical argument. Batiste, 121 So.3d at 872 (¶ 181).[5]
D. Lethal Injection
¶ 82. Finally, Dickerson contends that execution by lethal injection will violate Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008). Dickerson asserts that death by lethal injection has not yet been determined to pass.muster under the standards promulgated in Baze, and he asks the Court to remand the casé to the trial- court to conduct a full hearing in that regard. The State responds that the issue is procedurally barred because Dickerson failed to raise it at trial. Further, the State maintains that -the argument has been rejected by the Court. The State is correct in both regards. Again, an identical argument was made in Batiste and the Court held:
Batiste claims- Mississippi’s lethal-injection protocol violates Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), and constitutes cruel and unusual punishment. Because. Batiste failed to challenge the method of execution at trial, this issue is procedurally barred. Chamberlin v. State, 55 So.3d 1046, 1056 (Miss.2010). Notwithstanding the procedural bar, this' issue is without merit. This Court “has held unequivocally that Mississippi’s method of lethal injection does not violate the Eighth Amendment.” Id. (citing Bennett v. State, 990 So.2d 155, 161 (Miss.2008)). In Chamberlin, we stated:
*34 If differences exist between Mississippi’s execution protocols and those used in Kentucky, then, the inquiry is whether Mississippi’s lethal-injection protocol meets Constitutional muster in light of this recent Supreme Court decision. The Fifth Circuit, when considering inmate Dale Leo Bishop’s Eighth-Amendment challenge to Mississippi’s lethal-injection procedures, recently announced that “Mississippi’s lethal injection protocol appears to be substantially similar to Kentucky’s protocol that was examined in Baze.” We agree with the Fifth Circuit’s analysis, and hold that Bennett’s Eighth Amendment challenge to the lethal injection protocol in Mississippi is without merit.
Chamberlin, 55 So.3d at 1056 (quoting Bennett, 990 So.2d at 161) (citations omitted).
Batiste, 121 So.3d at 872-73(182). See also Corrothers v. State, 148 So.3d 278, 324 (¶ 131) (Miss.2014); Keller v. State, 138 So.3d 817, 874 (¶ 168-70) (Miss.2014). Dickerson’s argument is without merit.
IX. Whether Dickerson’s death sentence is constitutionally and statutorily disproportionate.
¶ 83. Dickerson asserts that the death penalty is constitutionally and statutorily disproportionate in the case sub ju-dice due to his chronic mental illness. He claims that his “intellectual and cognitive deficits and his other mental health disorders were at least substantial contributing factors to this crime,” so the death sentence is “disproportionate to his culpability.” As discussed above, the expert testimony did not support a finding a that Dickerson was mentally retarded. During the sentencing phase, the jury heard testimony from a psychologist and a social work professor about Dickerson’s personality disorders and deficits in adaptive functioning; former DHS employees about Dickerson’s living conditions as a child; and family, friends, and employers about Dickerson’s childhood and work abilities. The jury was able to consider all of that evidence in mitigation during sentencing deliberations. They jury found that the aggravating factors outweighed the mitigating factors.
¶ 84. When reviewing the imposition of the death penalty, in addition to reviewing the merits of all issues raised on appeal, the Court is required to determine:
(a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;
(b) Whether the evidence supports the jury’s or judge’s finding of a statutory aggravating circumstance as enumerated in Section 99-19-101;
(c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; and
(d) Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error, or both.
Miss.Code Ann. § 99-19-105(3) (Rev.2007). There is no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. As discussed above, the evidence supports the jury’s finding of the statutory aggravating factors.
¶ 85. Comparing other factually similar cases in which a death sentence was imposed, we conclude that the death penalty is not excessive or disproportionate in the *35 instant case. The Court has upheld the death penalty for capital murders committed during the commission of a robbery. See, e.g., Flowers, 158 So.3d at 1075(166); Batiste, 121 So.3d at 873 (¶ 183); Gillett, 56 So.3d at 524 (¶ 164). We have upheld the death penalty in cases where the crime was particularly gruesome and heinous, as here, where multiple weapons were involved, multiple wounds were inflicted, and the victim’s death was torturous. Batiste, 121 So.3d at 870, 873 (¶¶ 172, 183); King, 960 So.2d at 441, 447 (¶¶ 54, 73); Mitchell v. State, 792 So.2d 192, 220-211 (¶ 110) (Miss.2001). Finally, we have upheld the death penalty in the face of a defendant’s challenge that the death penalty was disproportionate in light of the defendant’s claims about his own mental health. Goff, 14 So.3d at 669-72 (¶¶ 202-208) (bipolar disorder and psychotic features); Berry v. State, 703 So.2d 269, 293-94 (¶¶ 88-92) (paranoid schizophrenia). Dickerson’s death sentence is not disproportionate to the crime.
X. Whether the cumulative effect of the errors mandates reversal of the guilty verdict and/or the death sentence.
¶ 86. Dickerson claims that the cumulative error doctrine requires reversal of his conviction and sentence. Under the cumulative error doctrine, where one error, standing alone, may not warrant reversal, reversal may be required if the errors, taken together, “create such an atmosphere of bias, passion, and prejudice that they effectively deny the defendant a fundamentally fair trial.” Flowers, 158 So.3d at 1075 (¶ 168) (quoting Goff, 14 So.3d at 672 (¶ 210)). In the instant case, we have determined that each issue raised by Dickerson is without merit. Because there are no individual errors, there is no cumulative error.
Conclusion
¶ 87. Dickerson’s convictions for capital murder, arson, and armed robbery and sentence of death were properly decided by the jury and are affirmed.
¶ 88. COUNT I: CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH, AFFIRMED. COUNT II: CONVICTION OF ARSON AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT III: CONVICTION OF ARMED ROBBERY AND SENTENCE OF FORTY (40) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. THE SENTENCES IN COUNT II AND COUNT III ARE TO RUN CONSECUTIVELY TO EACH OTHER.
WALLER, C.J., RANDOLPH, P.J., LAMAR, CHANDLER, AND PIERCE, JJ., CONCUR. RANDOLPH, P.L, SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION : JOINED BY WALLER, C.J., LAMAR, CHANDLER, PIERCE, AND COLEMAN, JJ. DICKINSON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND KING, JJ.; CHANDLER, J„ JOINS IN PART.

. Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

. We recognize that the phrase “mentally retarded” meets with disfavor in modern discourse. However, because the scope of Atkins is at issue in the instant appeal, we continue to use the phrase as it was used by the Supreme Court in Atkins.

. The Court has reached the same conclusion in multiple cases.. See, e.g., Corrothers v. State, 148 So.3d 278, 317-18 (¶ 107-08) (Miss.2014); Edwards v. State, 737 So.2d 275, 316-17 (Miss.1999); Wilcher v. State, 697 So.2d 1123, 1136 (Miss.1997); Holland v. State, 705 So.2d 307, 353-54 (Miss.1997). Dickerson contends that the cases are distinguishable because the failure to grant the instruction in his case exacerbated the circuit judge’s errors in failing to grant other instructions. Because we do not fin’d that the circuit judge erred by failing to grant any jury instruction, the claim is without merit.

. "[Tjhis Court has repeatedly rejected similar arguments based on Ring and Apprendi, holding both of them inapplicable to Mississippi’s capital sentencing scheme.” Ross, 954 So.2d at 1014 (¶ 119) (citing Bennett, 933 So.2d at 952).

. In fact, all of Dickerson's arguments pertaining to aggravating circumstances, constitutionality of the death penalty, and dispro-portionality of the death sentence have been raised — nearly verbatim — in several recent capital cases by the same attorneys at the Office of the State Public Defender. Each time, the claims have been rejected by this Court. See Corrothers v. State, 148 So.3d 278 (Miss.2014); Keller v. State, 138 So.3d 817 (Miss.2014); Batiste v. State, 121 So.3d 808 (Miss.2013).