# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-DR-01385-SCT

*TIMOTHY NELSON EVANS a/k/a TIMOTHY N.*
*EVANS a/k/a TIMOTHY EVANS a/k/a TIM EVANS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/15/2017 |
| TRIAL JUDGE: | HON. LISA P. DODSON |
| TRIAL COURT ATTORNEYS: | TODD THRIFFILEY |
| | PHILLIP WITTMAN, IV |
| COURT FROM WHICH APPEALED: | HANCOCK COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF CAPITAL POST-CONVICTION COUNSEL |
| | BY: BENJAMIN H. McGEE, III |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: CAMERON L. BENTON |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | POST-CONVICTION RELIEF DENIED - 03/12/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, CHIEF JUSTICE, FOR THE COURT:**

¶1. On June 15, 2017, this Court affirmed Timothy Nelson Evans's capital-murder conviction and sentence of death. *Evans v. State*, 226 So. 3d 1 (Miss. 2017). The mandate issued on October 5, 2017.

¶2. On October 5, 2018, a Motion for Post-Conviction Relief or in the Alternative for Leave to Proceed in Trial Court with a Petition for Post-Conviction Relief (PCR) was filed

on Evans's behalf by the Mississippi Office of Capital Post-Conviction Counsel (OCPCC). The State of Mississippi then filed its Response, to which a Rebuttal was filed on Evans's behalf by the OCPCC.

¶3. Because this Court concludes that Evans's PCR claims fail to present a substantial showing of the denial of a state or federal right, the PCR is denied.

## FACTS AND PROCEDURAL HISTORY

¶4. In August 2013, a jury in the Circuit Court of Hancock County found Evans guilty of capital murder (the underlying felony was robbery).[1] At the outset of sentencing, the State incorporated all testimony, evidence, and exhibits from the guilt phase of the trial into the sentencing phase. The State argued that the capital offense was committed for pecuniary gain during the course of a robbery. During sentencing, Evans presented two witnesses: (1) Dr. Robert M. Storer, who had performed a forensic mental-health evaluation of Evans and was accepted as an expert in clinical and forensic psychology; and (2) Dr. Marc Zimmermann,

---

[1]On direct appeal, this Court recounted the pertinent facts in great detail. *Evans*, 226 So. 3d at 9-11.

The victim was Wenda Holling, a seventy-two-year-old woman with whom Evans (then fifty-two years old) had previously been "romantically involved . . . ." *Id.* at 9. Stated succinctly, Evans "strangled [Holling] to death[,]" took her credit card, and then used it at various locations, until it was declined the following day. *Id.* at 10. More than one month later, the United States Marshals Service "apprehended Evans in a hotel room in Florida." *Id.*

Evans subsequently provided statements/correspondence to law-enforcement officials and local media in which he acknowledged his plan to kill Holling with the intent to steal her credit card. *Id.* at 10-11, 35, 41. An article published by *The Sun Herald*, following a reporter's interview with Evans, provided that Evans "had expressed remorse and said that he deserved to go to death row, did not deserve the mercy of the court, and '[i]f he could, he would plead guilty today and get a death sentence.'" *Id.* at 11.

who had performed a mental evaluation of Evans for the purpose of determining mitigating circumstances and was accepted as an expert in clinical and forensic psychology. At the close of sentencing, the jury determined "there are insufficient mitigating circumstance[s] to outweigh the aggravating circumstance," and Evans was sentenced to death.

¶5.     On June 15, 2017, this Court affirmed Evans's conviction and sentence of death. *Id.* at 41-42. On September 28, 2017, this Court denied Evans's motion for rehearing. The mandate issued on October 5, 2017. On June 28, 2018, the United States Supreme Court denied Evans's petition for writ of certiorari. *Evans v. Mississippi*, 138 S. Ct. 2567, 210 L. Ed. 2d 1104 (2018).

## STATEMENT OF THE ISSUES

(1)     Whether Evans is entitled to post-conviction collateral relief based on the ineffective assistance of trial counsel in:

> (A)     investigating, presenting, and explaining "all of the evidence available for mitigation[;]"
>
> (B)     failing to object to improper argument by the State; and/or
>
> (C)     "failing to communicate and obtain a plea offer" from the State "in exchange for a life sentence."

(2)     Whether Evans is entitled to post-conviction collateral relief because he "should be barred categorically from the death penalty due to permanent mental illness."

## ANALYSIS

¶6.     From a procedural standpoint

> When a conviction and sentence have been affirmed on appeal, the petitioner must seek and obtain leave from this Court before seeking relief in the trial court. Miss. Code Ann. § 99-39-7 (Rev. 2015). Leave is granted only

if the application, motion, exhibits, and prior record show that the claims are not procedurally barred and that they "present a substantial showing of the denial of a state or federal right." Miss. Code Ann. § 99-39-27(5) (Rev. 2015). Well-pleaded allegations are accepted as true. **Simon v. State**, 857 So. 2d 668, 678 (Miss. 2003) (citing **Moore v. Ruth**, 556 So. 2d 1059, 1061-62 (Miss. 1990)).

In capital cases, non-procedurally barred claims are reviewed using "'heightened scrutiny' under which all bona fide doubts are resolved in favor of the accused." **Crawford v. State**, 218 So. 3d 1142, 1150 (Miss. 2016) (quoting **Chamberlin v. State**, 55 So. 3d 1046, 1049-50 (Miss. 2010)). "[W]hat may be harmless error in a case with less at stake becomes reversible error when the penalty is death." **Crawford**, 218 So. 3d at 1150 (quoting **Chamberlin**, 55 So. 3d at 1049-50).

**Ronk v. State**, 267 So. 3d 1239, 1247 (Miss. 2019).

**(1)  Whether Evans is entitled to post-conviction collateral relief based on the ineffective assistance of trial counsel.**

¶7.   At trial, Evans was represented by court-appointed attorneys Todd Thriffiley and Phillip Wittmann, IV. On direct appeal, he was represented by Wittmann and Alison Steiner of the OCPCC. Under these circumstances, Evans's claims of ineffective assistance of trial counsel are not procedurally barred at this stage. *See* M.R.A.P. 22(b); **Archer v. State**, 986 So. 2d 951, 954 (Miss. 2008); **Woodward v. State**, 635 So. 2d 805, 807-08 (Miss. 1993) ("Where the same counsel represents the defendant at trial and on direct appeal, the claim is procedurally viable on application for post-conviction relief." (citing **Perkins v. State**, 487 So. 2d 791, 792-93 (Miss. 1986))).

¶8.   Substantively, ineffective-assistance-of-counsel claims involve

a two-pronged inquiry: the defendant must demonstrate that his counsel's performance was deficient and that the deficiency prejudiced the defense of the case. To establish deficient performance, a defendant must show that his

attorney's representation fell below an objective standard of reasonableness.[2] To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different.[3] A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Ross*, 954 So. 2d at 1003-04 (citations omitted).

(A)     Investigating, presenting, and explaining "all of the evidence available for mitigation"

¶9.     As to ineffective-assistance-of-counsel claims based upon the failure to investigate and/or effectively present mitigation evidence, this Court has stated that "[w]hile counsel is not required to exhaust every conceivable avenue of investigation," *id.* at 1005 (citing *State v. Tonkman*, 564 So. 2d 1339, 1343 (Miss. 1990)), there is "a duty 'to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Id.* at 1005 (quoting *Strickland v. Washington*, 466 U.S. 668, 691, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)); *see also* *Ronk*, 267 So. 3d at 1257 ("In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." (quoting *Wiggins*, 539 U.S. at 521-22)). "The assessment . . . includes not only what counsel

---

[2]"'Reasonableness' is based on 'prevailing professional norms.'" *Ronk*, 267 So. 3d at 1248 (quoting *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003)). "Our review is highly deferential to the attorney, with a strong presumption that the attorney's conduct fell within the wide range of reasonable professional assistance." *Ross v. State*, 954 So. 2d 968, 1004 (Miss. 2007) (citing *Howard v. State*, 853 So. 2d 781, 796 (Miss. 2003)).

[3]"Put differently, 'there must be "[a] reasonable probability that at least one juror would have struck a different balance.""" *Ronk*, 267 So. 3d at 1248 (quoting *Isham v. State*, 161 So. 3d 1076, 1089 (Miss. 2015)).

discovered, but also whether that evidence would have led a reasonable attorney to investigate further." ***Ronk***, 267 So. 3d at 1257-58 (citing ***Wiggins***, 539 U.S. at 527).

*Pretrial Mental-Health Evaluation*

¶10.    Evans filed a Motion for Psychiatric and/or Psychological Evaluation "to determine whether he knew right from wrong at the time of the alleged incident, whether he is competent to assist counsel in the trial of his case, *and whether or not a psychological evaluation would reveal any mitigating circumstances*." (Emphasis added.) Following a hearing, the circuit court entered an Order for Psychiatric Evaluation and directed "that a psychiatric evaluation by [Mississippi State Hospital (MSH)] be scheduled for [Evans] and performed without delay . . . ."

¶11.    The record reflects considerable delay in Evans's evaluation at MSH due to staffing limitations and a backlog of "capital murder defendants that were in front of [Evans] that were pending an evaluation." The circuit court entered an Amended Order for Mental Evaluation which provided the "mental evaluation[,]" which was to include "any mitigating circumstances[,]" was to "be given . . . at the earliest possible date . . . ." Dr. Storer evaluated Evans on two separate occasions, in December 2012, and January 2013. By late February 2013, the parties received Dr. Storer's forty-three-page report.

¶12.    Dr. Storer's report addressed, *inter alia*, Evans's family history of alcohol abuse; the "fast life" of his parents; the divorce of Evans's parents when he was around seven years old and the resulting separation of the family (i.e., Evans and several siblings remained in Michigan with their father, while the other siblings moved to Florida with their mother);

6

Evans's moving to Florida to live with his mother (whom he had not seen for years) around his freshman year in high school after his father "got into trouble with the feds"; the physical, emotional, and verbal abuse inflicted upon Evans by his mother;[4] a traumatic burn injury suffered by Evans at a young age;[5] and Evans's claim that he began drinking alcohol when he was around ten years old and smoking marijuana "in the ninth grade" and had consistently done so ever since.

*Pretrial Mitigation Investigation*

¶13.    Evans filed an *Ex Parte* Motion for Funds to Perform Mitigation Investigation and for Other Relief which sought "provision of funds necessary to retain an *expert in the field of mitigation investigation* and to perform said investigation." (Emphasis added.)  The motion provided that "[d]efense counsel is unable without the assistance of an investigator to locate, interview and prepare all mitigation witnesses" and proposed Stacy Ferraro "as the mitigation expert."  On June 1, 2011, the circuit court entered an Order Authorizing Funds to Perform Mitigation which provided for Ferraro "to perform the mitigation investigation for" Evans.

¶14.    At a later hearing, defense counsel informed the circuit judge that Ferraro "had a scheduling conflict and had to take herself off the case."

¶15.    In a subsequent hearing, Evans's counsel provided that the mitigation investigation would be performed by "a different person than the original person who was cited in the order, but I will present a separate order to you in that event."  At a hearing, Evans's counsel

---

[4]For example, Dr. Storer's report referenced Evans's claim that his mother would blame him for her divorce and would angrily tell Evans that he was "just like" his father.

[5]Evans recounted his hospitalization and the resulting skin grafts to Dr. Storer.

stated Dr. Zimmermann would perform the mitigation investigation and requested additional funds for such. That same day, the circuit court entered an Order that provided, in pertinent part, that Ferraro "never performed any [mitigation investigation] services in this case[,]" that Dr. Zimmermann "has been contacted by [Evans's] attorneys and has agreed to perform the mitigation investigation[,] and that funds must be approved for that purpose." Dr. Zimmermann conducted his evaluation of Evans "for assessment of mitigating factors" and then submitted a seven-page "Preliminary Psychological Evaluation."

¶16. In his report, Dr. Zimmermann discussed, *inter alia*, Evans's family history of alcohol abuse; the divorce of Evans's parents when he was around seven years old and the previously referenced separation of the family; Evans's being "diagnosed with anxiety" as a child; Evans's moving to Florida to live with his mother, with whom he had a troubled relationship, when he was fourteen years old; a traumatic burn injury suffered by Evans at a young age; the "plate in the right side of [Evans's] face," which allegedly "result[ed] from an attack"; Evans's claim that he had "at least four treatment experiences for problems with mood altering chemicals between 1981 and 2004"; and Evans's allegation that "[d]uring the period prior to his arrest, he was drinking a fifth of spirits per day" and "smoking one-fourth ounce of marijuana per day."

*Trial*

¶17. Trial commenced in 2013. On direct appeal, this Court summarized the evidence presented by Evans at sentencing, as follows:

> Dr. Storer testified that his testing showed that Evans had a full-scale IQ of 87, in the nineteenth percentile, and that he was not intellectually disabled. Based

8

on his interview of Evans, Dr. Storer opined that Evans had experienced a troubled childhood in which his parents had divorced and his mother had been emotionally abusive.[6] Evans began abusing alcohol and drugs at an early age.[7] Dr. Storer testified that Evans had a criminal history that was related to his abuse of alcohol and drugs. He diagnosed Evans with alcohol dependence, abuse of other substances, and conversion disorder which, he explained, is when "people have a lot of anxiety and . . . that anxiety comes out through physical symptoms."[8] He testified that, based on his interview with Evans, he might have been under extreme mental and emotional disturbance at the time of the offense. However, Dr. Storer emphasized that he had been unable to corroborate any of the information Evans had provided.[9] He

---

[6]Regarding Evans's childhood, Dr. Storer testified that Evans reported both his parents "had substance abuse problems, there was a lot of verbal violence in the home, . . . dad was absent quite a bit." Dr. Storer noted that, at the time of his parents' divorce, Evans was six years old, and "there were a lot of allegations of infidelity between" the couple. Dr. Storer testified that Evans initially went to live with his father following the divorce, while his mother moved to Florida; but when Evans was around fifteen years old, his father encountered "some legal problems," and Evans was sent to live with his mother, who had been (and continued to be) "emotionally abus[ive] . . . ."

[7]Specifically, Dr. Storer testified that Evans began drinking alcohol when he was ten years old and using marijuana when he was sixteen years old.

[8]Dr. Storer added that Evans "also had some elevations around traumatic past events continuing to bother him. The clinical label for people who have difficulty ongoing as a result of past traumatic events is PTSD, posttraumatic stress disorder, and this was suggested by some of the results of his psychological testing." But Dr. Storer went on to state that "[w]e were not able to find characteristic symptoms in order to say that he has that diagnosis."

[9]Dr. Storer noted that his data-collection efforts were impaired by the fact that Evans had lived in multiple states and had used various aliases over the years. Dr. Storer also reported that repeated attempts to contact Evans's mother and other family members were unsuccessful.

That said, Dr. Storer also testified that Evans "appeared to be giving good effort throughout all of the testing[,]" and the tests suggest "[h]e appeared to be answering items honestly, so the results appeared to be valid." For example, regarding Evans's alleged substance-abuse treatment, Dr. Storer opined that "the fact that [Evans] knew about substance abuse programs and the names of them in other states suggested to me . . . it was more likely than not that he did have some contact with those programs."

concluded that, at the time of the crime, Evans had not been "suffering from a mental disease or defect that would have prevented him from knowing the nature and quality of his alleged acts or from knowing the difference between right and wrong . . . ."

Dr. Zimmermann testified that he had performed a mental evaluation of Evans for mitigation purposes. Dr. Zimmermann concluded that Evans either was abusing alcohol and drugs or he was addicted to them. He also detected a cognitive disorder and some form of anxiety disorder, possibly [PTSD], but he testified that further testing would be needed for a conclusive determination. He opined that, due to Evans's anxiety and chemical dependence, he had been suffering from extreme emotional disturbance at the time of the crime. Like Dr. Storer, Dr. Zimmermann was unable to corroborate any of Evans's assertions about his history.

*Evans*, 226 So. 3d at 11-12.

¶18.    In the penalty-phase closing argument, Evans's counsel asserted,

the mitigating factors . . . outweigh the aggravating factors and . . . you should sentence [Evans] to life imprisonment without the possibility of parole. . . . [T]his crime was committed by [Evans] while he was under the influence of extreme mental or emotional disturbance. . . . He was drunk. . . . [Evans] was desperate for money to continue to drink . . . . You heard about his family history of mental illness, his family history of substance abuse. [Evans] comes from a broken family with little to no parental guidance at all. He was moved from Michigan to Florida at a young age and basically left to fend on his own. He started drinking at the age of 10, a fifth a day, started doing drugs. You heard about his limited formal education. . . . [Evans] didn't have the tools that most people have to succeed in life, and that culminated in his severe substance abuse and us being here today. . . .

¶19.    At sentencing, the jury was instructed, in pertinent part, to

[c]onsider only the following aggravating circumstance in determining whether the death penalty should be imposed:

1. The capital offense was committed for pecuniary gain during the course of a robbery.

. . . .

10

If the above aggravating circumstance is found to exist beyond a reasonable doubt, then each of you must consider whether there are mitigating circumstances which outweigh the aggravating circumstance. Consider the following elements of mitigation in determining whether the death penalty should not be imposed:

1. The offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

2. Any other matter, any other aspect of the Defendant's character or record, and any other circumstance of the offense brought to you during the trial . . . which you . . . deem to be mitigating on behalf of the Defendant, including but not limited to:

  a) Family history of mental illness;
  b) Family history of substance abuse;
  c) Separation and divorce of parents during childhood;
  d) Emotional abuse by his mother;
  e) Limited formal education;
  f) Personal [h]istory of substance use beginning in childhood; and
  g) Witnessing a traumatic event.[10]

If you individually find from the evidence that one or more of the preceding elements of mitigation exists, then you must consider whether they outweigh or overcome the aggravating circumstance you previously found.

¶20. At the close of sentencing, the jury determined "there are insufficient mitigating circumstance[s] to outweigh the aggravating circumstance," and Evans was sentenced to death.

*Evans's PCR Argument*

¶21. Evans now generally contends that "[t]rial counsel did not present and explain the significance of all of the evidence available for mitigation." More specifically, he insists that

---

[10]This list was taken nearly verbatim from the "non-statutory mitigating circumstances," which Dr. Storer's report concluded were "present" if Evans's "reporting of his personal history during this evaluation was accurate . . . ."

"trial counsel were ineffective in failing to perform a[n] investigation, failing to retain a mitigation specialist and trained investigator, and failing to obtain and present appropriate expert testimony to explain the connection between trauma and violent behavior."[11] According to Evans, the result was that, during the "penalty phase," his "trial lawyers gave a superficial overview of the severe trauma [he] experienced in his formative years[,]" which was "self-impeaching in its lack of corroboration" and then

> failed in th[e] constitutional duty to explain the connection between [his] capital crime and his early traumatic experience – the emotional abuse of his parents (especially his mother), the strong strain of alcoholism in his family, his parents' haplessness at dealing with his hyperactivity, the physical and psychological pain of his severe burn injury at age five, and the pattern of separation from family and society those experiences perpetuated.

In Evans's estimation, such "failure to present a cohesive case in mitigation was deficient and prejudicial under *Strickland*."

¶22.    To support his argument, Evans offers the three-page affidavit of one of his biological brothers, Douglas Roy Evans, and the eight-page affidavit of Robert G. Stanulis, PhD.

¶23.    According to Doug's affidavit, he "was never contacted by any member of [Evans's] trial defense team.  If I had been contacted, I would have provided information consistent with this affidavit."  Within the affidavit, Doug briefly discusses his family's history of alcohol abuse; the absence of "stability or real love" from their parents, who "lived a party life in high society in Detroit"; the promiscuity of their father; the divorce of their parents

---

[11]According to Evans, "a juror cannot 'give effect' to mitigating evidence if she does not hear why that evidence is important to the defendant's case against a death sentence[,]" i.e., "a reasonably certain psychological opinion about how a life of traumatic events had affected [Evans] or . . . how they created a maldeveloped adult capable of committing murder."

when Evans "was about seven years old" and the resulting separation of the family; their mother's "emotionally and verbally abusive" behavior;[12] a traumatic burn injury suffered by Evans at a young age;[13] and that Evans began drinking alcohol at "about 12 years old" and "never stopped drinking after that." Doug also opines that his mother "probably drank while she was pregnant."

¶24.  Dr. Stanulis's affidavit represents that he has "been licensed to practice psychology and neuropsychology since 1979" and has "worked on death penalty cases as both an expert witness and team consultant since 1993." In this matter, he conducted an "independent psychological and neuropsychological evaluation of" Evans in September 2018 and a telephone interview with Doug in October 2018. According to Dr. Stanulis, his evaluation of Evans "finds overall strong evidence of neurocognitive deficits, including memory and frontal lobe executive functioning deficits." His affidavit concludes, in pertinent part, that

---

[12]For example, Doug recounts that, in an effort to control the hyperactivity of Evans and his twin brother Michael their mother kept the boys "in a small [10' x 10'] pen made of snow fence with spikes at the top."

[13]According to Doug, Evans was "4 or 5 years old" when "he played with . . . matches and set his flannel pajamas on fire." Doug's affidavit provides that Evans's right leg was burned "virtually down to the bone[,]" that he remained "in the hospital burn unit for over a month and received skin grafts for several months after[,]" and that the injury "affected his walk for years."

[Evans] suffered multiple traumatic events[14] leading to PTSD, attachment disorder, and alcohol abuse.[15]

. . . While both Dr. Storer and Dr. Zimmermann noted cognitive disorder, neither one recommended or performed the required neuropsychological evaluation to document the very significant neuropsychological dysfunction found during this evaluation. Neither Dr. Storer nor Dr. Zimmermann recommended neurological testing . . . that would have provided other objective evidence of brain injury.[16]

. . . .

[Evans's] psychological problems and recent [traumatic brain injury (TBI)] resulted in him suffering from an extreme mental or emotional disturbance at the time of the instant offense. The combination of psychiatric and neuropsychological factors, together with reliving the rejection and abandonment by his mother, with [Evans's] impulse control issues and his inability to modulate his emotions due to impairment from a recent TBI, resulted in [Evans's] losing control and directing his long-standing severe emotional disturbance and anger at the victim. In essence, [Evans's] actions

---

[14]As to "trauma exposure[,]" Dr. Stanulis references "probable Fetal Alcohol Exposure; known parental rejection, neglect, and abandonment by his mother . . . ; a life-threatening burn with prolonged rehabilitation period and poor parental involvement; attempted sex abuse as a child; multiple head traumas . . . ; exposure to dead bodies post-Katrina; and head trauma sustained approximately 17 months before the instant offense." According to Dr. Stanulis, such "trauma history" was not sufficiently explained "[d]uring the penalty phase . . . ."

[15]For example, Dr. Stanulis opines that Evans's "alcohol abuse, which was likely affected by a number of genetic and family social values, was caused by trauma-related psychological damage resulting from abuse, neglect, and his life-threatening burn."

Relatedly, Dr. Stanulis submits that Evans "has several psychological diagnoses that need to be assessed by and testified to by more than one expert" (e.g., "experts in attachment disorder and trauma" to "explain that alcohol abuse is caused by trauma").

[16]Regarding such, Dr. Stanulis insists that "[n]europsychological evaluation for brain damage related to [FAS] and repeated head trauma was also clearly necessary." And, according to Dr. Stanulis, "[t]he failure to have a mitigation specialist investigate [Evans's] personal and familial history of alcoholism made it quite difficult for an expert to diagnose [him] with Fetal Alcohol Effect . . . ."

14

were in part the symbolic killing of his mother. These factors explain why this killing was committed by an individual in his 50s with little history of violence. It is also important because these types of extreme emotional events are the product of a "perfect storm" of factors . . . .

[Doug] was critical to diagnosing [Evans's] attachment disorder, which often presents with anti-social behavior and addiction.

¶25. Evans opines there was "ample evidence available" to "tell a jury [his] unique, individual story . . . ." But he insists the "evidence of trauma in [his] parents' alcoholism, their neglect, their emotional abuse of and alienation from their children, and in [his] harrowing experience as a burn victim as a little boy and multiple head injuries as an adult," was either not presented or lacking in effect due to "non-conclusive psychological evaluations based on zero corroborating evidence." Had there been "a thorough investigation of [his] background" (including Doug's being contacted by trial counsel and "corroborat[ing]" Evans's "self-reported mitigating experiences"),[17] along with "a neuropsychologist and a trauma expert who could explain the connection between [his] traumatic experiences . . . with the maldeveloped behavioral and cognitive condition that existed at the time of the offense[,]" Evans submits "there is a reasonable probability that at least one juror would have struck a different balance[.]" According to Evans, this claim involves "a 'substantial showing' that violations of his state and federal rights render his conviction and sentence unconstitutional" such that he is entitled to an evidentiary hearing. Miss. Code Ann. § 99-39-27(5) (Rev. 2015).

_____

[17]Evans is adamant that "corroboration" is among "the most important aspects of the value of [Doug's] affidavit to his . . . case against the death penalty" because "the prosecution exploited the lack of factual corroboration supporting Dr. Storer's and Dr. Zimmermann's already weak conclusions . . . ."

15

¶26. The State responds that "this claim devoid of merit." According to the State, "[t]wo experts testified in mitigation on Evans' behalf providing both facts and the psychological import of those facts." The State opines that the necessity of "another mental health expert . . . is simply a matter of opinion and falls within the ambit [of] trial strategy."

¶27. In any case, the State submits that, even "[a]ssuming *arguendo* that trial counsel's mitigation investigation should have been more far reaching in scope, what would they have discovered?" The State emphasizes that Evans has had "years to conduct the purported required independent investigation," yet "offers only one substantive affidavit from his brother Doug and a conclusory affidavit from Dr. Stanulis."[18] According to the State, "virtually all of what [Evans] now faults trial counsel for failing to 'discove[r] and present' was already known[,]" and much of it "was provided to the jury." Under these circumstances, the State asserts, "it is difficult to see how the absence of the currently presented 'proof,' resulted in prejudice to" Evans, as there are "*no new facts that would have substantially altered the sentencing equation*." (Emphasis added.)

*Recent Decisions*

---

[18]The State characterizes Dr. Stanulis's affidavit as a mere "attemp[t] to provide a more technical explanation of facts that were already known to trial counsel, Dr. Storer and the jury." And the State submits that the "diagnoses" within Dr. Stanulis's affidavit are largely "unsupported by corroborating facts" and "far beyond that of his purported expertise . . . ." For instance, the State takes issue with Dr. Stanulis's "seiz[ing]" upon Doug's uncorroborated allegation that their mother "probably drank while she was pregnant" in attempting to create an FAS issue.

16

¶28. This Court begins its discussion with the recent consideration of similar issues in ***Ronk*** and ***Hutto***.

*Ronk v. State*, 267 So. 3d 1239 (Miss. 2019)

¶29. In ***Ronk***, a pretrial "psychiatric/psychological evaluation" of the defendant was conducted by Dr. Beverly Smallwood. *Id.* at 1261. Her report included the following conclusions:

> [M]any variables which may provide mitigation are reportedly found in this man's psychological and medical history. However, I do not have the benefit of those medical records. It is highly recommended that these and other relevant records be secured and that collateral witnesses be interviewed. The present examination is not a mitigation study, which is outside the scope of my current practice.
>
> . . . .
>
> . . . [A]s noted, a mitigation study is recommended.

*Id.* at 1265. At sentencing, Dr. Smallwood was the lone witness for the defense, and "[h]er twenty-five page psychological evaluation was entered into evidence[.]" *Id.* at 1261. Dr. Smallwood's testimony included an acknowledgment that "she had not done a full mitigation study[,]" as "[t]hat's outside the scope of my practice . . . ." *Id.* (internal quotation marks omitted).

¶30. In Ronk's subsequent PCR, he maintained that trial counsel was ineffective because "no mitigation investigation was done" (e.g., "failing to investigate and obtain or use medical records" and "failing to hire a qualified expert—more specifically, a mitigation specialist"). *Id.* at 1265, 1267. In Ronk's estimation, Dr. Smallwood's "merely recounting the contents of her report [w]as insufficient—the data had to be *explained* by a qualified expert." *Id.* at

17

1267 (citing **Williams v. Taylor**, 529 U.S. 362, 399, 120 S. Ct. 1495, 1516, 146 L. Ed. 2d 389 (2000)). Ronk's PCR included attached affidavits from multiple relatives regarding trial counsel's failure to seek interviews or allegedly pertinent records. *Id.* at 1266. Additionally, "developmental psychologist" Dr. James Garbarino "examined Ronk at post-conviction counsel's request" and submitted an affidavit on his "findings . . . ." *Id.* at 1266-67. Ronk maintained that "[h]ad the jury heard such mitigating evidence, . . . a reasonable probability exists that the result would have been different." *Id.* at 1271**.**

¶31. In *Ronk*, this Court conceded that "[a]rguably, counsel's mitigation investigation was deficient." *Id.* Nonetheless, this Court found **Strickland**-level prejudice was lacking as "[t]he new evidence Ronk provides is *mostly cumulative*[.]" *Id.* at 1273-74 (emphasis added). While Dr. Garbarino may have "better explain[ed] and connect[ed] Ronk's behavior to child-development issues that included his adoption, sense of parental rejection, temperament, and attachment issues[,] . . . Dr. Smallwood conveyed many of those things." *Id.* at 1273. According to this Court,

> Dr. Smallwood covered the basic mitigating evidence supporting Ronk, and nothing offered now is new or different. In reweighing all the aggravating and mitigating evidence, no reasonable probability exists that at least one juror would have struck a different balance. *The new evidence merely expounds on or rounds out facts that were presented to the jury.* Moreover, this double-edged evidence is nowhere near the magnitude of the uncovered evidence in cases [in which post-conviction collateral relief was deemed warranted].

*Id.* at 1274 (emphasis added).

### **Hutto v. State**, 286 So. 3d 653 (Miss. 2019)

¶32. In *Hutto*, the petitioner maintained, *inter alia*, that

> [D]efense counsel was ineffective for failing to present expert psychological testimony to explain to the jury how Hutto's particular life history led to his violent behavior as an adult. This argument merges with Hutto's additional claim that defense counsel was ineffective by providing little more than an overview of Hutto's traumatic childhood. . . .
>
> . . . .
>
> To support his claim, Hutto presents the affidavit of [Dr. Garbarino], a psychologist. Hutto argues that a psychological opinion like Dr. Garbarino's would have made the difference between life and death when compared to Dr. Julie Schroeder's expert testimony presented to the jury.

*Id.* at 658. Yet this Court concluded that "Hutto fails to make a sufficient showing under ***Strickland***[,]" because "Dr. Garbarino's affidavit [was] essentially the same testimony presented at trial" and was "cumulative." *Id.* at 658, 660. This Court added that "Hutto fails to show his sentence would have been different had Dr. Garbarino or any other psychologist testified." *Id.* at 660.

¶33. The petitioner in ***Hutto*** also advanced a claim "that counsel was deficient in failing to present specific, individualized details of his trauma." *Id.* While acknowledging there was testimony at trial regarding his "trauma and behavior[,]" the petitioner maintained "the jury should have heard more details about his [history of suffering] abuse." *Id.* On that subject, this Court emphasized that "[c]laims that additional witnesses should have been called are disfavored." *Id.* at 661 (internal quotations marks omitted) (quoting ***Turner v. State***, 953 So. 2d 1063, 1074 (Miss. 2007)). This Court then deemed the claim to be "without merit[,]" as "a few more details and anecdotes" regarding abuse "would have been cumulative[,]" and "Hutto fails to show that the verdict and sentence would have been different had additional witnesses testified." *Id.*

19

*Analysis*

¶34.   In assessing deficient performance, this Court reiterates that "a heavy measure of deference" is extended to trial counsel's judgments regarding mitigation investigations. *Ronk*, 267 So. 3d at 1257 (quoting *Wiggins*, 539 U.S. at 521-22).

¶35.   From the early stages of this matter, Evans's trial counsel clearly recognized the necessity of a proper mitigation investigation. Defense counsel filed pleadings in the circuit court to obtain a mental-health evaluation of Evans, which included a determination of mitigating circumstances, and to commence the mitigation investigation. Sometime later, Dr. Storer submitted a forty-three-page report.

¶36.   As to the mitigation investigation, more than two years before trial, Evans's trial counsel obtained court authorization for Ferraro to perform such services, but she later had to decline the assignment. Eventually, Dr. Zimmermann agreed to perform the mitigation investigation, received court authorization of funding, evaluated Evans, and then submitted a seven-page "Preliminary Psychological Evaluation." Trial counsel then presented Dr. Storer and Dr. Zimmermann as experts during sentencing, and they each testified regarding mitigating circumstances.

¶37.   In this PCR, Evans emphasizes the lack of corroboration for his family-related childhood trauma. Yet this Court is dubious that the absence of such corroboration was a function of deficient performance by trial counsel. To that point, this Court finds notable that Dr. Storer's report and trial testimony provided that he "attempted to contact" Evans's mother, four of his siblings, his ex-wives and daughters, and several coworkers and "former

20

employers[,]" "all without success."[19] Furthermore, Dr. Storer opined that testing suggested that Evans "appeared to be answering items honestly . . . ."

¶38. Relatedly, this Court finds significant that, although Evans maintains the mitigation investigation was wholly inadequate, the only additional evidence he presents with this PCR is Doug's three-page affidavit and Dr. Stanulis's eight-page affidavit. The purported meager mitigating evidence presented at trial was less of function of trial counsel's deficient performance than a product of its nonexistence. *Evans*, 226 So. 3d at 33.

¶39. When the analysis above is coupled with the fact that Evans received expert testing and mitigation-investigation services from Dr. Storer and Dr. Zimmermann, this Court concludes that Evans fails to make the requisite showing of deficient performance by trial counsel in investigating, presenting, and explaining all available mitigation evidence. *See Hutto*, 286 So. 3d at 661 ("Claims that additional witnesses should have been called are disfavored." (internal quotation marks omitted) (quoting *Turner*, 953 So. 2d at 1074)); *Ross*, 954 So. 2d at 1005 ("where defense counsel has sought and acquired a psychological evaluation of the defendant for mitigation purposes, counsel generally will not be held ineffective for failure to request additional testing" (citing *Moore v. Parker*, 425 F.3d 250, 254 (6th Cir. 2005)).

¶40. But even assuming that trial counsel rendered deficient performance in the investigation, presentation, and explanation of mitigation evidence, this Court concludes the new evidence presented by Evans would hardly "have altered the sentencing profile

_____

[19]Relatedly, an affidavit from Evans's former PCR cocounsel, Carol R. Camp, provides that, in October 2017, Evans's mother and sister "both refused to speak with me."

presented," ***Ronk***, 267 So. 3d at 1258 (internal quotation mark omitted) (quoting ***Chamberlin v. State***, 55 So. 3d 1046, 1054 (Miss. 2010)), and only "round[ed] out the details of a personal history already presented to the jury." ***Ronk***, 267 So. 3d at 1258 (internal quotation marks omitted) (quoting ***Buckner v. Polk***, 453 F.3d 195, 207 (4th Cir. 2006)). Stated otherwise, "[t]he new evidence . . . is *mostly cumulative*[.]" ***Id.*** at 1273-74 (emphasis added); *see also* ***Hutto***, 286 So. 3d at 660-61. Dr. Storer and Dr. Zimmermann "covered the basic mitigating evidence supporting" Evans. ***Ronk***, 267 So. 3d at 1274. Their reports and trial testimony addressed nearly all of the topics referenced in Doug's affidavit. And the mitigating circumstances the jury was instructed to consider almost comprehensively touch upon the subjects raised in Doug's affidavit. In sum, Doug's affidavit does little more than provide "a few more details and anecdotes" regarding the alleged childhood trauma experienced by Evans. ***Hutto***, 286 So. 3d at 661.

¶41. Now, "entirely new, unheard testimony is not cumulative." ***Davis v. State***, 87 So. 3d 465, 472 (Miss. 2012). But Doug's uncorroborated assertion that their mother "probably drank while she was pregnant[,]" which Dr. Stanulis attempts to link with "probable Fetal Alcohol Exposure" that contributed to "neurocognitive deficits," is far too speculative to warrant post-conviction collateral relief. *See* ***Ross***, 954 So. 2d at 1005-06 ("[D]efense counsel cannot be held ineffective for failing to discover a mitigating factor, such as organic brain damage, that the defendant cannot show exists in any post trial motion." (citing ***Thompson v. Bell***, 315 F.3d 566 (6th Cir. 2003), *rev'd on other grounds*, 545 U.S. 794, 125 S. Ct. 2825, 162 L. Ed. 2d 693 (2005))).

22

¶42. Perhaps Dr. Stanulis (or other experts) could "better explai[n] and connec[t]" Evans's behavior to his trauma, but Dr. Storer and Dr. Zimmermann "conveyed many of those things." *Ronk*, 267 So. 3d at 1273. And given the overwhelming evidence of Evans's guilt, and the clear existence of the aggravating circumstance of a "capital offense . . . committed for pecuniary gain during the course of a robbery[,]" this Court cannot conclude that the additional evidence presented in this PCR creates "[a] reasonable probability that at least one juror would have struck a different balance." *Id.* at 1248 (internal quotation marks omitted) (quoting *Isham*, 161 So. 3d at 1089).

¶43. Accordingly, Evans's request for leave to proceed in the trial court with this claim is denied, because he fails to present a substantial showing of the denial of a state or federal right.

*(B)    Failing to object to improper argument by the State*

¶44. During the guilt-phase closing arguments, the State submitted that

> [w]hen [Evans] comes before you and he ask[s] for sympathy and for mercy today the question really is what sympathy and what mercy did he show [Holling] . . . [?] When he's asking you to let sympathy play into your decision making I ask you what sympathy did he show [Holling] . . . ? What mercy did he show [Holling]? I ask you, ladies and gentlemen, to show him the same mercy that he showed her. . . . He asked you today for mercy, give him the same mercy he showed her, give him justice, give justice to the family of [Holling] . . . .

In the penalty-phase closing arguments, the State reiterated its argument: "[w]hat mercy did he show [Holling]? What mercy did he show her family when he publicized their mother's death for all of South Mississippi to read about?" The State also asked the jury to consider Holling and asked, "[w]hat were her thoughts at that time?" Finally, the State asserted, in

23

pertinent part, that "[t]aking a credit card and using somebody's credit card is not a reason to impose the maximum penalty. That's not why we're here today. We're here today because he took a life . . . ."

¶45. On direct appeal, Evans maintained that several of the statements above implicated prosecutorial misconduct in "making constitutionally improper and prejudicially inflammatory closing argument." *Evans*, 226 So. 3d at 31. For instance, he insisted that, in asking the jury to consider Holling's "thoughts at that time[,]" the State advanced "an improper golden-rule argument . . . ."[20] *Id.* Evans further argued the State erroneously submitted he "had asked for mercy . . . ." *Id.*

¶46. Preliminarily, this Court concluded Evans's argument was "procedurally barred" since he failed to present objections at trial. *Id.* Nonetheless, this Court proceeded to consider "whether the alleged prosecutorial misconduct was so inflammatory that the trial judge should have intervened." *Id.* On that subject, this Court determined that "[w]hile the prosecutor's argument . . . approaches a golden-rule violation, the argument was not so inflammatory as to have required intervention by the trial court. Thus, no plain error occurred." *Id.* at 32. This Court also held that "Evans admits that this Court has never

---

[20]A "golden-rule argument" essentially "asks the jurors to put themselves in the place of one of the parties . . . ." *Holliman v. State*, 79 So. 3d 496, 500 (Miss. 2011) (citing *Wells v. State*, 698 So. 2d 497, 507 (Miss. 1997)). And, according to this Court, "to advise jurors to decide a case as they would want it decided if they or their loved ones were the litigants is to establish a false standard for the basis of judgments." *Id.* at 500 (quoting *Danner v. Mid-State Paving Co.*, 252 Miss. 776, 173 So. 2d 608, 611 (1965)). As such, this Court has stated "the use of a golden-rule argument is reversible error." *Id.* at 500 (citing *Danner*, 173 So. 2d at 608).

addressed the question of whether a penalty-phase argument to show the defendant the same mercy as he showed the victim is per se improper. We find no plain error occurred." ***Id.***

¶47. Evans now asserts that trial counsel "rendered ineffective assistance in failing to object to improper argument by the prosecution." He specifically references trial counsel's failure to object to the State's "improper 'golden-rule' arguments" (or "riff[s]") and the State's "misstatement of the law . . . ."[21] And Evans claims prejudice insofar as his "constitutional rights to a fair and impartial trial and due process were violated as a result of his trial counsel's failure to object . . . ." According to Evans, this Court's opinion on direct appeal held a "clear implication . . . that a proper objection at trial would have made its analysis on appeal different."

¶48. The State responds that this "exact same claim" was raised and rejected on direct appeal and is now being "packaged" under the guise of ineffective assistance of counsel. And, according to the State, the claim is "without merit[,]" because "[t]he prosecutor did not make inappropriate comments that warranted an objection." Stated otherwise, "[t]rial counsel cannot be at fault for failing to lodge meritless objections." Furthermore, the State insists that "this Court has already recognized [Evans] was not prejudiced by the prosecutor's comments."

---

[21] According to Evans

[b]y telling jurors that "[t]aking a credit card and using somebody's credit card is not a reason to impose the maximum penalty," the prosecutor was telling the jury it could ignore the only aggravating factor, murder committed in the course of a robbery, and sentence him to death solely because he had been convicted of killing [Holling].

25

¶49. Preliminarily, this Court notes there is a "'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[,]'" *Hutto*, 286 So. 3d at 666 (quoting *Strickland*, 466 U.S. at 687) and that "'broad latitude'" is extended to prosecutors in closing arguments. *Hutto*, 286 So. 3d at 663 (quoting *Walker v. State*, 913 So. 2d 198, 240 (Miss. 2005)); *Ross*, 954 So. 2d at 1004 (citing *Howard*, 853 So. 2d at 796). Furthermore, with respect to the State's closing-argument reference to "mercy" and Holling's "thoughts," even assuming that the failure to object constituted deficient performance,[22] this Court's direct-appeal ruling that "no plain error occurred" rules out the possibility of *Strickland*-level prejudice. Regarding the prosecution's credit-card comment during closing argument, even if the failure to object rose to the level of deficient performance, this Court concludes there was no *Strickland*-level prejudice, because the jury was well-instructed on the requisite considerations in determining "whether the death penalty should be imposed . . . ."

¶50. Accordingly, Evans's request for leave to proceed in the trial court with this claim is denied, because he fails to present a substantial showing of the denial of a state or federal right.

*(C) "[F]ailing to communicate and obtain a plea offer" from the State "in exchange for a life sentence"*

¶51. "[C]laims of ineffective assistance of counsel in the plea bargain context are governed by the two-part test set forth in *Strickland*." *Missouri v. Frye*, 566 U.S. 134, 140, 132 S. Ct.

---

[22]This assumption is highly suspect given that this Court stated the prosecutor's argument only "*approach[ed]* a golden-rule violation" and that such a "mercy" argument had not been deemed "per se improper." *Evans*, 226 So. 3d at 32 (emphasis added).

1399, 1405, 182 L. Ed. 2d 379 (2012). "[A]s a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Id.* at 145. Furthermore

> To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel. Defendants must also demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it, if they had the authority to exercise that discretion under state law. To establish prejudice in this instance, it is necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time.

*Id.* at 147.

¶52. In correspondence with the State dated May 31, 2013, Evans requested that the prosecution "[p]lease advise . . . as to whether you have a plea recommendation on this charge . . . ." At the hearing on July 2, 2013, the State represented that "there is always the potential for" a plea offer, but "[t]here is nothing on the table at this time." At the hearing on August 8, 2013, eleven days before trial, the State reiterated that "[t]here is always a possibility" of "disposition without trial[,]" but that "[t]here ha[ve] *not* been any offers made or anything like that." (Emphasis added.) Likewise, Evans's counsel acknowledged that "we *haven't* been made an offer, a plea offer . . . ." (Emphasis added.)

¶53. Evans now maintains that "[t]rial counsel rendered ineffective assistance in failing to communicate and obtain a plea offer from the prosecution in exchange for a life sentence." He submits that trial counsel "failed to develop a viable attorney-client relationship with"

27

him, and actually "reached out to another local attorney, Jim Davis, to seek his advice on how they could convince [Evans] to plead guilty."

¶54. In support of this claim, Evans provides an affidavit from Ferraro which states, in pertinent part, that

> 10. Prior to [Evans's] capital trial in August 2013, [Davis], a Gulfport attorney with whom I had previously worked on Mississippi capital cases, contacted me to see if I would be willing to travel to Hancock County to convince [Evans] to accept a plea deal that had been offered to him. [Davis] advised me that [Evans's] trial attorneys were having trouble communicating with him and that they needed assistance convincing [Evans] to plead.
>
> 11. I did not assist [Evans's] trial attorneys by speaking with [Evans] about whether or not to accept a plea offer. . . .

¶55. Additionally, Evans submits his own affidavit, in which he states that trial counsel never "presented me with a plea offer from the Hancock County District Attorney's Office. If they had told me that the prosecutor would let me plead guilty in exchange for a life without parole sentence, I would have been willing to do so." Evans argues he was prejudiced by this alleged deficient performance of trial counsel because, with knowledge of an offer, he would have pleaded guilty.

¶56. In response, while the State "agrees that the failure to communicate a plea deal is error[,]" it maintains that "[t]here was no plea offer extended by the prosecution." The State emphasizes that the "statements in open court[] by sworn officers of the court" reflect the absence of a plea offer and questions the reasonableness of any such offer in a case in which Evans "repeatedly admitted to the murder and actually asked that the death sentence be

28

imposed."[23]  According to the State, the only potential support for Evans's claim lies in the affidavit of Ferraro, an attorney "who never entered an appearance in this case."  And notably absent is "any affidavit from [Davis] who allegedly communicated with [Ferraro] about Evans' case and the mysterious plea deal."  Under these circumstances, the State maintains there is no viable basis for Evans's claim that trial counsel was ineffective for failing to communicate a plea offer.

¶57.   This Court agrees with the State.  The record reflects that Evans's trial counsel and the State made multiple representations to the trial court that there was *no* plea offer.  When coupled with the fact that Evans fails to provide affidavits on this subject from his trial attorneys or Davis, the proof now advanced by Evans is insufficient to justify post-conviction collateral relief.  Under the circumstances presented, Ferraro's affidavit does not amount to the sort of "[w]ell-pleaded allegatio[n]," *Ronk*, 267 So. 3d at 1247 (citing *Simon v. State*, 857 So. 2d 668, 678 (Miss. 2003)), that creates "bona fide doubts," *Ronk*, 267 So. 3d at 1247 (quoting *Crawford v. State*, 218 So. 3d 1142, 1150 (Miss. 2016)), on the existence of a formal plea offer that must be "resolved in favor of the accused."  *Ronk*, 267 So. 3d at 1247 (quoting *Crawford*, 218 So. 3d at 1150).  Not only did Ferraro never appear as an attorney in this case, but she also fails to provide any details of the alleged plea offer.  *See Davis*, 87 So. 3d at 473 ("[E]ven assuming that a plea offer existed, we cannot ascertain its terms.").  In the absence of a formal plea offer, trial counsel cannot be deemed to have rendered

_____

[23]The State adds that it "has been advised that no plea offer was extended by the prosecution in this case" but that it "is prohibited from conducting discovery unless or until the petitioner is allowed to proceed in the trial court."

29

deficient performance for failure to communicate such. *Id.* ("We affirm the circuit court's finding that trial counsel's performance was not deficient for failure to communicate a plea offer because Davis has failed to prove that the State tendered a plea offer."). Accordingly, Evans's request for leave to proceed in the trial court with this claim is denied, because he fails to present a substantial showing of the denial of a state or federal right.

### (2) *Whether Evans is entitled to post-conviction collateral relief because he "should be barred categorically from the death penalty due to permanent mental illness."*

¶58. Dr. Storer's report opined that, "to a reasonable degree of psychological and medical certainty," Evans was competent; that Evans "was not mentally retarded pursuant to" *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002); and that Evans had "intellectual functioning" that was "not sub-average and . . . no evidence of adaptive deficits." Pretrial, Evans's counsel did not contest that Evans was "competent both to assist . . . as well as to proceed to trial." At trial, Dr. Storer testified that Evans "had a full-scale IQ of 87, in the nineteenth percentile," obtained his General Education Diploma, and "was not intellectually disabled." *Evans*, 226 So. 3d at 11-12. On direct appeal, this Court found "no evidence that Evans's substantive right not to be convicted while incompetent was violated. . . . [T]he record in this case reveals that the trial court was assiduously vigilant to ensure Evans's competence to stand trial was protected." *Id.* at 18.

¶59. Now, relying upon Dr. Stanulis's affidavit, Evans submits he "suffers from several psychological impairments" and neuropsychological deficits. Evans argues he "should be barred categorically from the death penalty due to permanent mental illness." According to Evans, the same "rationales that led the U.S. Supreme Court to ban any use of the death

30

penalty against intellectually disabled inmates . . . should apply with equal force to inmates with permanent mental illnesses or neurocognitive disorders."

¶60. Preliminarily, the State "disputes Evans' claim that he actually has a serious mental illness." In any case, the State responds that Evans "is essentially asking that this Court expand the definition of intellectual disability to include a serious mental illness" but that an "identical claim" was "flatly rejected" in *Dickerson v. State*, 175 So. 3d 8 (Miss. 2015).

¶61. In *Dickerson*, the defendant argued "that, even if he was competent to stand trial, the evidence of his history of mental illness precludes imposition of the death penalty." *Id.* at 15. He compared "the mentally ill to the mentally retarded and to juveniles, who have 'diminished personal culpability,' and who are constitutionally ineligible for the death penalty . . . ." *Id.* at 17 (citing *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); *Atkins*, 536 U.S. at 304). As such, the defendant requested this Court "hold that mentally ill defendants are exempt from the death penalty." *Dickerson*, 175 So. 3d at 17.

¶62. But this Court rejected that argument and held,

> Dickerson is neither under eighteen nor mentally retarded. Therefore, he is not exempt from the death penalty under *Atkins* or *Roper*. We will not extend those cases to apply to the mentally ill when "[t]he Supreme Court has never held that mental illness removes a defendant from the class of persons who are constitutionally eligible for a death sentence." [*Ripkowsi v. Thaler*, 438 Fed. Appx. 296, 303 (5th Cir. 2011)]. We cannot take the *Atkins* opinion—which was so specific to mental retardation that the Court cited and discussed the clinical definition of mental retardation—and apply it to all other mental disorders. To do so would be no different than taking *Roper* and expanding it to preclude execution of criminals under age twenty-one, rather than age eighteen as the Supreme Court explicitly held. *Dickerson's alternative argument that the death penalty cannot be imposed on the mentally ill is without merit.*

*Id.* at 18 (emphasis added). Based upon that holding in ***Dickerson***, Evans's request for leave to proceed in the trial court with this claim is denied, because he fails to present a substantial showing of the denial of a state or federal right.

## CONCLUSION

¶63.    This Court concludes that Evans's PCR claims fail to present a substantial showing of the denial of a state or federal right. Accordingly, Evans's PCR is denied.

¶64.    **POST-CONVICTION RELIEF DENIED.**

**KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**